101 A.3d 706

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Jeffrey Robert MARTIN, Appellant.**

Supreme Court of Pennsylvania.

Argued April 10, 2012.

Decided Sept. 24, 2014.

626

630

632

Harry J. Cancelmi Jr., Esq., Waynesburg, for Jeffrey Robert Martin.

Amy Zapp, Esq., PA Office of Attorney General, Linda Marie Chambers, Esq., Waynesburg, for Commonwealth of Pennsylvania.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

## OPINION

Justice McCAFFERY.

This is a direct appeal from a death sentence imposed after a jury convicted Appellant of one count of first-degree murder and other charges arising from the strangulation death of a twelve-year-old girl. The jury concluded, with respect to the circumstances of the murder, that the aggravating factors (committing murder to prevent testimony in a possible criminal proceeding regarding a felony and committing a killing in

perpetration of a felony) outweighed the mitigating circumstances ("character and record"). Thus, the jury imposed a sentence of death.

The primary issues raised by Appellant concern whether the evidence was sufficient to support the jury's guilty verdicts for the additional charges of rape, sexual assault, and statutory sexual assault. Appellant argues that because there was insufficient evidence to prove that the killings had been committed during the perpetration of these felonies, the jury considered non-existing aggravating circumstances when it imposed the sentence of death. Appellant also challenges the ruling of the suppression court that allowed certain evidence to be presented against him at trial. For the reasons that follow, we affirm.

The facts, when viewed in the light most favorable to the Commonwealth as verdict-winner, show that on June 13, 2006, G.B., a twelve-year-old girl, was reported missing by her parents. Notes of Testimony ("N.T.") Trial, 5/1/08, at 188, 197–98. The girl and her family lived in a rural corner of Pennsylvania, and she was reported missing on the day of her disappearance. *Id.* at 197–98. The Pennsylvania State Police immediately initiated a search that was later joined by the Federal Bureau of Investigation ("FBI"), other agencies, canine units, and civilian searchers. Police interviews with neighbors and other witnesses revealed that G.B. had been riding her small all-terrain vehicle ("ATV") on the morning of her disappearance and was last seen heading in the direction of a neighboring horse and pleasure farm that she had previously visited with her parents' permission. *Id.* at 204, 211–12, 241. The owners of the farm were away that morning; however, their sole hired farmhand, Appellant, Jeffrey Robert Martin, was working alone there at the time. N.T. Trial, 5/5/08, at 872, 874. Among Appellant's duties was the collection and spreading of manure. N.T. Trial, 5/1/08, at 309.

On June 16, Appellant waived his right to counsel and agreed to be interviewed by agents of the FBI. He did not make any incriminating statements and was released. N.T. Trial, 5/5/08, at 699–701. However, late in the day on June 17,

2006, and four days after G.B. had been reported missing, her ATV was found partially buried in a creek bank and under a top layer of manure near a horse trail on the farm where Appellant had very recently spread manure as part of his duties. N.T. Trial, 5/1/08, at 58; N.T. Trial, 5/5/08, at 685–86, 747–48, 778. Appellant, who was working on the farm at the time, was immediately placed under arrest for tampering with evidence, giving false information, and hindering a police investigation (N.T. Trial, 5/5/08, at 714, 749, 800), and taken to an area of the farm near to where the ATV had been found. *Id.* at 566, 584. Appellant was advised of his *Miranda* rights [1] and then told that searchers had found G.B.'s ATV. *Id.* at 572, 628, 637, 687, 749. At that point, Appellant stated to a state trooper that there were new trails "down there" and that he had spread manure in that area. *Id.* at 687, 750, 780. The trooper pointed out to Appellant that he had never told Appellant where the ATV had been found. *Id.* at 750. Nevertheless, Appellant stated that "she's not down there," and then denied that he knew where G.B. was. *Id.* at 572, 688, 750, 781. Shortly afterward, Sergeant Kevin T. Kolson of the Pennsylvania State Police arrived on the scene, asked if Appellant had been read his rights, and, assured that he had been, asked Appellant where G.B. was, while jabbing his fingers into Appellant's chest. *Id.* at 750–51. Appellant did not respond. *Id.* at 629–30, 639, 751, 784. No further questions were asked of Appellant at that time; however, he was then moved to a nearby area that was not as crowded with personnel searching for the missing girl. *Id.* at 751, 785. There, after the state troopers began questioning him, Appellant stated, "I think I need an attorney," and all questioning immediately stopped. *Id.* at 587, 645, 690–92, 717, 751–52, 785–86.

Appellant was returned to the area of the farm that was being used as a staging area for the search, and kept in the back seat of a patrol car while the state troopers continued their search and investigation of the site where the ATV had been found. *Id.* at 693, 707–08. Standing near the patrol car

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

was a local constable who knew Appellant. The constable asked Appellant if he was ok. *Id.* at 670. Shortly thereafter, Appellant volunteered that he could save everyone some time, stating that only the ATV was down in the creek area, not G.B., and that she was somewhere else. *Id.* at 602, 671. The constable called to the nearby state troopers to inform them that Appellant had something to say. *Id.* at 602. Upon returning to the patrol car, the state troopers re-advised Appellant of his *Miranda* rights (*Id.* at 602, 678, 694–95, 754), transported Appellant back to the more quiet area of the search perimeter, once again advised Appellant of his right to remain silent and to consult with an attorney, and then requested that Appellant sign a written waiver of those rights as given him. *Id.* at 652–54, 696, 721. Appellant stated that he did not want to sign anything without consulting a lawyer. *Id.* at 696, 721. However, Appellant immediately volunteered that he been approached by a "fat, bald guy in a white truck," who offered him $100 to help bury an ATV. *Id.* at 573, 591–92, 696, 720, 755. The troopers perceived this statement to be a falsehood, became frustrated with Appellant, and returned with him to the staging area on the farm. *Id.* at 573, 591–92, 696–97, 721–22, 755–56.

There, the troopers, concerned about the safety of the missing girl, pleaded with Appellant to divulge the girl's whereabouts. *Id.* at 575–76, 602–03, 761. Appellant first stated that he could show the troopers where the girl's helmet and shoes were buried (*Id.* at 576, 761–62), and shortly afterward stated that he could show the troopers where G.B. was located. *Id.* at 762. Appellant told the troopers that they would need a backhoe to "recover" the girl. *Id.* at 578, 703, 726, 762. This statement confirmed that G.B. was dead-until this point, the troopers had continued to treat the investigation as one involving a missing child.

Appellant led the troopers to a spot near where the ATV had been found and indicated that in one spot they would find the girl's helmet, and in another spot several feet away they would find her shoes. N.T. Trial, 5/1/08, at 68; N.T. Trial, 5/5/08, at 576–77, 702, 725, 762–63. At or about this time,

Appellant volunteered that he had not molested the girl. N.T. Trial, 5/5/08, at 577, 595, 600, 762, 798–99. Appellant then stated that the girl's body was at a different location on the farm and pointed the troopers to an area which was near a burn pile. *Id.* at 703–04, 725, 763–64. Before being transported to the police station, Appellant stated to the troopers that he had spread lime on G.B.'s body before covering it with earth in order to interfere with the ability of search dogs to find the girl's remains. *Id.* at 578, 595–96, 600, 764.[2]

After digging at the spot by the burn pile pointed out to them by Appellant, the officers found G.B.'s body buried more than five feet underground. N.T. Trial, 5/1/08, at 117–18, 149. They found that the girl's shirt had been pulled up to her armpits, and that her panties and jeans had been pushed down around her thighs and ankles. *Id.* at 149, 154; Commonwealth Exhibits 28–29, 31–32. Her body was indeed covered with lime, and two empty 50 lb. lime bags were found lying on top of her lime-covered body. N.T. Trial, 5/1/08, at 124–25, 149, 158, 172–78; N.T. Trial, 5/2/08, at 508; Commonwealth Exhibit 27. An autopsy subsequently revealed that she had been sexually assaulted and manually strangled.[3] N.T. Trial, 5/2/08, at 389–96, 400–01, 407–08, 420–21; Commonwealth Exhibit 66.

After being taken to the Waynesburg State Police Station, Appellant was once again given his *Miranda* rights, but he agreed to waive them and signed a written waiver to that effect. N.T. Trial, 5/5/08, at 705, 731–34, 770; Commonwealth Exhibit 89. He then gave a confession that was tape-recorded. N.T. Trial, 5/5/08, at 727–29, 770; Commonwealth Exhibit 90. In his confession, he explained that on the morning of June 13, 2006, G.B. had appeared on the farm on her ATV and, for no apparent reason, according to Appellant, stated that she was going to tell her parents that he had just

**2.** Appellant also described to the troopers where they could find some of G.B.'s personal effects that he had thrown into the woods and fields to conceal them. N.T. Trial, 5/5/08, at 765–68.

**3.** The troopers also found G.B.'s helmet and shoes in the locations indicated to them by Appellant. N.T. Trial, 5/1/08, at 66–72.

molested her. N.T. Trial, 5/5/08, at 706. Appellant then stated that he had "panicked" and grabbed at the child, who ran away down the driveway. Commonwealth Exhibit 90 (transcript of Appellant's recorded confession) at 2. Appellant was able to catch up with her and, once he did, "jumped on top of her" and placed his hands around her neck. N.T. Trial, 5/5/08, at 706, 794; Commonwealth Exhibit 90 at 2. Appellant stated that he choked G.B. until she stopped moving, which, he observed, "took a good while." N.T. Trial, 5/5/08, at 706–07, 796; Commonwealth Exhibit 90 at 2. He stated that he then went to get a farm vehicle called a mule, on which he placed the girl's body and took it to the area of the farm where the burn pile was located. N.T. Trial, 5/5/08, at 707; Commonwealth Exhibit 90 at 2. He then went back to the farm shed to retrieve a backhoe on which he placed two bags of lime. Commonwealth Exhibit 90 at 3. He returned to the burn pile site with the backhoe, dug a hole, placed the girl's body in the hole, and covered the body with the contents of two bags of lime. N.T. Trial, 5/5/08, at 707; Commonwealth Exhibit 90 at 3. He placed the used, empty lime bags in the hole, filled the hole with the backhoe, and smoothed the dirt on top to conceal the hole. N.T. Trial, 5/5/08, at 707; Commonwealth Exhibit 90 at 4. Appellant then took G.B.'s ATV, helmet and shoes to another area of the farm and buried the ATV in a hole near the creek that wound through the farm; he buried the helmet and shoes in two nearby locations. Commonwealth Exhibit 90 at 4. He also stated that he had had to flatten the tires on the ATV to make it fit in the hole he had dug, but that, even so, the vehicle remained unconcealed, so he returned to the ATV burial site with manure, which he piled and spread on top of the mostly buried ATV. N.T. Trial, 5/5/08, at 707–08; Commonwealth Exhibit 90 at 24–5. Appellant then returned the backhoe to the farm shed. Commonwealth Exhibit 90 at 5.

Appellant was charged with criminal homicide, aggravated assault, and four counts of tampering with physical evidence. After the autopsy of G.B.'s body, however, evidence was detected that led to the filing of additional charges against Appellant: rape of a child, statutory sexual assault, aggravat-

ed indecent assault of a child, sexual assault, and abuse of corpse. A preliminary hearing on the initial charges was held on June 21, 2006, and the charges were bound over to court. Afterward, because of the autopsy findings, the Commonwealth filed a notice of aggravating circumstances. A preliminary hearing on the second set of charges was held on September 20, 2006, and all of these charges were similarly bound over to court. The cases were consolidated for trial.

Appellant filed an omnibus pre-trial motion, which was denied following a hearing. The jury trial commenced on May 1, 2008. In addition to the evidence of the police investigation and arrest of Appellant as outlined above, including Appellant's confession, the Commonwealth presented the testimony of Dr. Cyril Wecht, the forensic pathologist who had performed the autopsy on G.B.'s body. The Commonwealth also introduced into evidence Dr. Wecht's autopsy report. Dr. Wecht's findings led him to conclude that G.B. had died by manual strangulation. Additionally, Dr. Wecht testified that the body showed evidence, in the form of an area of acute or fresh hemorrhage, that G.B.'s vagina had been penetrated by a blunt object consistent with a penis. N.T. Trial, 5/1/08, at 388–89. Dr. Wecht opined that the injury had occurred "anywhere from just shortly before death or at the time of death or maybe an hour or two." *Id.* at 391. Although he could not exclude the possibility that the injury inside G.B.'s vagina could have been caused by some other type of blunt object, such as a finger or rounded pen, Dr. Wecht opined "with reasonable medical certainty, not absolute certainty but with reasonable medical certainty, that the most likely instrumentality or object that would have produced [the] injury would have been a penis," based on the coinciding evidence that G.B.'s pants and panties had been pulled down and that she had died by manual strangulation. *Id.* at 421–23.

After the Commonwealth presented its evidence, Appellant testified on his own behalf. Appellant explained that on the morning G.B. went missing, he had spied a white truck at the end of the farm driveway attended by a "young looking guy with long brown hair." N.T. Trial, 5/5/08, at 877. Appellant

testified that this person stated that he had run out of gas and, in addition, he also had a four-wheeler (ATV) that he wanted to "get rid of for the insurance." *Id.* at 877. The person then offered Appellant $100 to help him dispose of the ATV, an offer that Appellant "really didn't think about" but "just went along with," offering to this stranger that "there might be somewhere ... where we could ... get rid of it." *Id.* at 877. Appellant then testified that as he backed his farm mule up to the rear of the truck in order to load the ATV onto it, he noticed that the man threw some other items onto the mule. *Id.* at 878. The two then purportedly discussed the need for shovels to bury the ATV; additionally, the man took an interest in the farm's backhoe that was in a shed and walked over to the shed to inspect it. *Id.* at 879. After the inspection of the backhoe, the man then purportedly climbed back onto the mule, which by now had the ATV on its back, and the two men drove the mule down the driveway, with a detour to obtain a shovel from the barn, and onto a horse trail to search for a place to deposit and bury the ATV. *Id.* at 881–82. The two found a spot, and with shovels, dug a hole. They then deposited the vehicle into the hole after flattening the tires. *Id.* at 882–85. While Appellant was burying the ATV with dirt extracted from the hole, the man told Appellant that he had a helmet and a pair of shoes that he also wished to dispose of, which items apparently had accompanied the men on their ride on the mule. *Id.* at 885. The man instantly found nearby spots to dig holes, into which he deposited these items, while Appellant continued burying the ATV, peering at the man's activities through brush and small trees. *Id.* at 886.

Appellant then testified that when the two were riding back toward the man's truck, the man began throwing items such as a makeup kit and lighter onto the farm property from the mule, apparently without Appellant's protest. *Id.* at 887. The man then requested a gallon of gas from Appellant, which Appellant procured without question from the farm's shed. *Id.* at 887–88. Appellant went on to testify that when he later went over to the truck to retrieve the gas can from the man, Appellant spied in the passenger side of the truck a gray coat,

from under which protruded "some hair and a hand," with a pair of legs "sticking over the seat down on to the floor." *Id.* at 889. When Appellant asked the man what it was he was seeing, the man responded that "there was an accident." *Id.* This information, according to Appellant, rendered him "scared and confused" so that he "didn't know what to do." *Id.* Purportedly at this point, Appellant stated that he did not want anything more to do with the man's needs or intentions. *Id.*

Appellant testified, however, that a discussion ensued between Appellant and the man about the backhoe in the shed, which discussion included Appellant mentioning that the key was not in the backhoe. *Id.* at 890–91. Appellant then stated that he resumed his work, although he remained scared and confused. However, as Appellant tended to his chores, he heard the backhoe start up. *Id.* at 889. The man then passed Appellant on the backhoe and made a further inquiry as to whether it was lime that he had seen in the shed. *Id.* at 892. When Appellant assured him that it was, the man then retrieved two bags of lime from the shed, again without Appellant's protest. Appellant resumed his work in the barn, as the stranger drove his employers' backhoe around the farm. *Id.* at 892–93.

Apparently, at the point when he could no longer hear the backhoe, Appellant became curious and drove the mule up the farm road and met the man as he was getting off the backhoe. The man then stated to Appellant: "I'm going to take you up here and show you ... where I buried her at." *Id.* at 894. Appellant went with the man, the man showed Appellant where he had buried the body on the farm, and further volunteered that he had dug a six-foot hole, placed "her" in it, and placed lime and the empty lime bags on top prior to filling in the hole. *Id.* at 894–95; 1044–45. Appellant noticed that there was a small fire burning at the spot, in which fire the man stated he had placed a shirt, a pair of gloves, and a purse, further stating to Appellant that he should let the fire burn itself out. Appellant responded, however, that he could not let the fire continue to burn, although it was nearly out. At that

point, the man got in his truck and left, without giving Appellant the promised $100 for the ATV disposal. *Id.* at 895. Appellant then put the backhoe away, resumed his work, and left about five or six in the afternoon. *Id.* at 896–97.

Appellant continued to testify that before he finished work and left the farm that day, the police and G.B.'s father had appeared on the farm in search of the missing G.B. *Id.* at 899–900. It was at that point, Appellant testified, that he developed the thought that the body buried on the farm might be G.B. *Id.* at 900–01; 1012. Although interviewed by the police, Appellant provided no information at that time regarding the extraordinary events that had purportedly taken place on the farm that morning. Even as the State Police, the FBI, the family of G.B., and volunteers searched frantically on the farm and surrounding areas for the missing girl, Appellant went on with his chores. It was not until several days later, after he had been arrested and then "abused and tortured" by the police, that Appellant provided them with information about the man with a white truck. *Id.* at 967. Appellant admitted at trial, however, to telling the police as he was walking with them to show them the burial site of G.B., that he "never molested her K or sexually assaulted her any way [sic]." *Id.* at 929; 1003. He testified further that he recognized the shoes that were buried on the farm as belonging to G.B. because they were "the shoes she always wore down to the barn" and that he had "seen them before." *Id.* at 900–01. Also, Appellant testified that the mysterious man had told Appellant that the shoes in his possession had belonged to G.B. *Id.* at 900–01.

On May 8, 2008, the jury returned guilty verdicts on all charges except for third-degree murder, and on the following day, it determined that Appellant should be sentenced to death. Thereafter, the trial court ordered an evaluation of Appellant by the Pennsylvania Sexual Offenders Assessment Board ("SOAB") because of his conviction for the sexual offenses. After this evaluation, Appellant's sentencing hearing was held on September 17, 2008, at which time the Commonwealth presented an expert witness on the issue of

the applicability of "Megan's Law"[4] to Appellant. At the conclusion of the hearing, the trial court adjudicated Appellant to be a sexually violent predator,[5] and sentenced Appellant to death for committing the offense of murder in the first-degree, and to twenty-three to forty-six years' incarceration on the other charges.

Appellant filed post sentence motions, which the trial court denied, and this direct appeal followed. Thereafter, upon court order, Appellant filed a statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(b).

Appellant presents the following issues for our review, as set forth verbatim:

I. Where there was no eyewitness testimony, where there was no admission of sexual intercourse, where there was no evidence of seminal fluid[,] and where the forensic pathologist could not testify to a reasonable degree of medical certainty that there was evidence of penile penetration, was there sufficient evidence beyond a reasonable doubt to conclude that the defendant engaged in "sexual intercourse" as defined by 18 Pa.C.S.A. § 3101 and as an element of the crime of Rape in 18 Pa.C.S.A. § 3121(c) [rape of a child] or as an element of the crime of sexual assault in 18 Pa.C.S. § 3124.1 [sexual assault]?

II. Where there is not sufficient evidence of the crime of rape or sexual assault, is it error to charge the jury that the jury could consider such evidence by incorporating it in the penalty phase of the proceeding?

III. Where a finding of being a sexually violent predator is based in part on the defendant's conviction for rape, sexual assault[,] and statutory sexual assault for which

4. 42 Pa.C.S. § 9791 *et seq.*

5. The SOAB examiner presented evidence of the following: that Appellant had previously been (1) convicted of molesting two nine-year-old children at his place of employment when he was seventeen; (2) convicted of making serial lewd telephone calls; (3) arrested for molesting his own daughter; and (4) assessed by three different mental health examiners as suffering from a personality disorder and antisocial personality traits.

there is not sufficient evidence, should such a finding be set aside?

IV. Was it error for the trial judge to charge the jury that the jurors could consider the crime of rape, sexual assault, and statutory sexual assault as an aggravating circumstances [sic] to support a death penalty verdict?

V. Was the death verdict the product of a denial of [Appellant's] right to due process of law and a fair trial?

VI. Did the suppression court err in failing to find that [A]ppellant was denied his right to be free of unwarranted search and seizure and his right not to incriminate himself under the United States and Pennsylvania Constitutions when his pretrial suppression and other motions were denied and when such statements were admitted over objection at trial?

Appellant's Brief at 7 (Statement of Questions Involved).

First, we shall conduct this Court's automatic review of the sufficiency of the evidence to sustain the conviction for first-degree murder. Then, we shall address the above issues in a manner that roughly comports with the chronological unfolding of the trial process.

## SUFFICIENCY OF THE EVIDENCE TO SUPPORT FIRST–DEGREE MURDER

■ In all capital cases, we have a self-imposed duty to conduct an independent review of the sufficiency of the evidence to sustain a conviction for first-degree murder. *Commonwealth v. Flor*, 606 Pa. 384, 998 A.2d 606, 615 (2010); *Commonwealth v. Pruitt*, 597 Pa. 307, 951 A.2d 307, 313 n. 4 (2008).

■ There is sufficient evidence to sustain a conviction when the evidence admitted at trial, and all reasonable inferences drawn therefrom, viewed in the light most favorable to the Commonwealth as verdict-winner, are sufficient to enable the fact-finder to conclude that the Commonwealth established all of the elements of the offense beyond a reasonable doubt. *Commonwealth v. Markman*, 591 Pa. 249, 916 A.2d 586, 597 (2007). The Commonwealth may sustain its burden "by

means of wholly circumstantial evidence." *Id.* at 598. Further, we note that the entire trial record is evaluated and all evidence received against the defendant is considered, being cognizant that the trier of fact is free to believe all, part, or none of the evidence. *Id.*

■■■■■ To sustain Appellant's conviction of first-degree murder, we must conclude that the evidence proved beyond a reasonable doubt the three elements of first-degree murder: (1) a human being was unlawfully killed; (2) the defendant was responsible for the killing; and (3) the defendant acted with malice and a specific intent to kill. 18 Pa.C.S. § 2502(a); *Commonwealth v. Houser*, 610 Pa. 264, 18 A.3d 1128, 1133 (2011). First-degree murder is an intentional killing, *i.e.*, a "willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(a) and (d); *Commonwealth v. Fears*, 575 Pa. 281, 836 A.2d 52, 59 (2003). This Court has held on several occasions that evidence of death by strangulation can be sufficient to establish the requisite intent for first-degree murder. *See Pruitt, supra* at 314, 951 A.2d 307; *Commonwealth v. Mitchell*, 588 Pa. 19, 902 A.2d 430, 445 (2006); *Commonwealth v. Simmons*, 541 Pa. 211, 662 A.2d 621, 629 (1995).

Here, the Commonwealth proved that G.B. was unlawfully killed, that Appellant was responsible for the killing, and that Appellant acted with malice and a specific intent to kill. G.B.'s body was found buried in a hole on a farm where Appellant worked. The body was autopsied, the autopsy report was admitted into evidence, and Dr. Cyril Wecht, the forensic pathologist who performed the autopsy, testified at trial. Dr. Wecht's testimony and the autopsy report established that G.B. died of asphyxia due to manual strangulation, based on findings of abrasions and contusions to the neck area, focal hemorrhages of the muscles and soft tissues of the neck, and fractures of the thyroid cartilage and hyoid bone. *See* N.T. Trial, 5/2/08, at 400–01. Appellant's tape-recorded confession, where he admitted to strangling the girl, was played to the jury. N.T. Trial, 5/5/08, at 771, 774. Appellant also admitted to the prison warden that he had killed G.B. and that he would request the death penalty. *Id.* at 738, 741.

Appellant was able to show the police where and how G.B.'s body was buried, as well as where her shoes and helmet were buried, and where other personal effects of G.B. could be found on the farm. Thus, the evidence indisputably supported the jury's conclusion that G.B.'s death was a homicide, that Appellant was responsible for G.B.'s death, and that Appellant had acted with malice and a specific intent to kill by strangling G.B. until she was dead and then burying her body in a hole. This evidence is sufficient to support the *mens rea* element of first-degree murder, *i.e.*, a specific intent to kill. *See Commonwealth v. Johnson*, 459 Pa. 141, 327 A.2d 124, 127 (1974) ("The admitted acts of placing a knotted cord around the neck of an elderly woman and so rigging it as to strangle are consistent" with the specific intent to take the life of another human being and thus support a first-degree murder conviction).

Accordingly, and based on our review of the entire record, we conclude that the Commonwealth's evidence, and all reasonable inferences deducible therefrom, was indeed sufficient to establish beyond a reasonable doubt each element of the first-degree murder of G.B. We turn now to the issues raised by Appellant, in the order stated.

## UNWARRANTED SEARCH AND SEIZURE/SUPPRESSION (Appellant's Issue VI)

Appellant challenges the denial of his pre-trial suppression motion, contending: (1) his arrest was unlawful; (2) as a consequence, the statements he made to the police subsequent to the unlawful arrest were incurably tainted; and (3) in the event it is determined that his arrest was lawful, he had never validly waived his *Miranda* rights, and thus, his statements made to police were inadmissible at trial for that reason as well.

■■■ Our review of a denial of a suppression motion is informed by the following principles:

[O]ur initial task is to determine whether the [suppression court's] factual findings are supported by the record. In making this determination, we must consider only the evi-

dence of the prosecution's witnesses, and so much evidence of the defense that remains uncontradicted when fairly read in the context of the record as a whole. When the evidence supports· the factual findings, we are bound by such findings; we may reverse only if the legal conclusions drawn therefrom are erroneous.

*Commonwealth v. Perez*, 577 Pa. 360, 845 A.2d 779, 788 (2004) (citation omitted).

## A. Arrest

Appellant's unlawful arrest argument takes two tracks. First, because it appears to Appellant that he was arrested on misdemeanor charges not committed in the presence of the arresting officers, he asserts there was no legal authority for the police to arrest him without a warrant. Second, Appellant argues that there was no probable cause to arrest him on any charge, whether felony or misdemeanor.

 Regarding the issue of warrantless arrest, Appellant cites to the suppression court testimony of Trooper Thomas W. Schuster that Appellant was arrested at the farm, following the discovery of the buried ATV belonging to G.B., for "tampering with physical evidence and hindering police investigation and for providing false information to law enforcement officers." Appellant's Brief at 22, citing N.T. Suppression Hearing, 4/25/07, at 21. Appellant asserts that these crimes are misdemeanors, and that he is not aware of any statute that would permit a warrantless arrest for these misdemeanors when they have occurred outside of the presence of the arresting officer. *See* Pa.R.Crim.P. 502(2)(c) (providing that a criminal proceeding may be instituted by a warrantless arrest "upon probable cause when the offense is a misdemeanor not committed in the presence of the police officer making the arrest, when such arrest without a warrant is specifically authorized by statute").[6]

6. Appellant notes that of the initial crimes identified by the police, he was ultimately charged only with tampering with or fabricating physical evidence. However, he acknowledges that he is "aware" that the fact that the other charges were not subsequently filed against him is

Regarding the issue of probable cause, Appellant asserts that the only evidence in the possession of the police prior to his arrest was that Appellant worked on a farm near the house of the missing girl; *Appellant had denied any knowledge of or complicity in the disappearance of the girl;* and an ATV was found in an area covered by manure that not just Appellant, but any number of persons, including the many searchers, had access to. Appellant's Brief at 25; *see also* Memorandum in Support of Appellant's Omnibus Pre–Trial Motion, filed 10/9/07, at 12. Appellant contends that because this information could not serve as a basis for satisfying the probable cause required to make an arrest, his rights under the Fourth Amendment to the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution were violated. Appellant further relies on *Commonwealth v. Farley,* 468 Pa. 487, 364 A.2d 299 (1976), which observed that "[e]vidence obtained following an illegal arrest must be suppressed unless the Commonwealth can establish that the evidence is sufficiently purged of any taint from the illegal arrest." *Id.* at 302.

The Commonwealth counters that Appellant has not presented an argument that comports with the applicable standard of review, noting that Appellant has not challenged any of the sixty-five factual findings made by the suppression court judge, and asserting that Appellant has not identified any of the judge's legal conclusions as being erroneous. Rather, the Commonwealth asserts that Appellant has simply repeated the arguments made in the brief filed in support of his pre-trial motion.

On the merits, the Commonwealth acknowledges that Appellant was arrested without a warrant; however, it also asserts that the suppression judge, with full support of the record, had concluded that the State Police had probable cause "to believe that [Appellant] was involved in the disappearance of 12[-]year[-]old [G.B.]," and was further involved in the "attempted cover-up of what had happened to her." Common-

not "definitive in showing a potential lack of probable cause, both under Federal and Pennsylvania jurisprudence." Appellant's Brief at 24 n. 2.

wealth's Brief at 22. The Commonwealth argues that a warrantless arrest may be justified, as here, where probable cause is established by the totality of the circumstances and where criminal activity is only "one reasonable inference" that can be made from the evidence. *Id.* Because probable cause thus existed to support Appellant's warrantless arrest, the Commonwealth asserts that the arrest was lawful and that Appellant's subsequent statements to police were untainted.

In evaluating Appellant's argument that he was unlawfully arrested, we take note of the following principles:

[L]aw enforcement authorities must have a warrant to arrest an individual in a public place unless they have probable cause to believe that 1) a felony has been committed; and 2) the person to be arrested is the felon. A warrant is also required to make an arrest for a misdemeanor, unless the misdemeanor is committed in the presence of the police officer. The legislature, however, has authorized law enforcement officers to make warrantless arrests for misdemeanors committed outside their presence in certain circumstances.

*Commonwealth v. Clark,* 558 Pa. 157, 735 A.2d 1248, 1251 (1999) (citations omitted).

In order to determine whether probable cause exists to justify a warrantless arrest, we must consider the totality of the circumstances. *Id.* at 1252; *see also Illinois v. Gates,* 462 U.S. 213, 233, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). "Probable cause exists where the facts and circumstances within the officer's knowledge are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed," and must be "viewed from the vantage point of a prudent, reasonable, cautious police officer on the scene at the time of the arrest guided by his experience and training." *Clark, supra* at 1252 (quotation omitted). As we have stated:

Probable cause is made out when the facts and circumstances which are within the knowledge of the officer at the time of the arrest, and of which he has reasonably trustwor-

thy information, are sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime. The question we ask is not whether the officer's belief was correct or more likely true than false. Rather, we require only a *probability,* and not a *prima facie* showing, of criminal activity. In determining whether probable cause exists, we apply a totality of the circumstances test.

*Commonwealth v. Thompson,* 604 Pa. 198, 985 A.2d 928, 931 (2009) (emphasis in original; citations and quotation marks omitted).

 In the Fourth Amendment context, "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action." *Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). In other words,

Fourth Amendment reasonableness is predominantly an objective inquiry. We ask whether the circumstances, viewed objectively, justify the challenged action. If so, that action was reasonable whatever the subjective intent motivating the relevant officials. This approach recognizes that the Fourth Amendment regulates conduct rather than thoughts....

*Ashcroft v. al–Kidd,* 563 U.S. 731, ——, 131 S.Ct. 2074, 2080, 179 L.Ed.2d 1149 (2011) (citations and quotation mark omitted).

 In consideration of the above principles, the main focus of Appellant's argument, which is on the specific crimes articulated by the arresting officer, is misplaced. *See Maryland v. Pringle,* 540 U.S. 366, 370, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003) (observing that the probable cause standard is a "nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."). Again, the inquiry must simply focus on whether the relevant *facts and circum-*

*stances* within the arresting officer's knowledge are sufficient to lead any person of reasonable caution to conclude that an offense has been or is being committed, based on a *"probability,* and not a *prima facie* showing, of criminal activity." *Thompson, supra* at 931, quoting *Gates, supra* at 235, 103 S.Ct. 2317.

Here, the relevant facts and circumstances were the disappearance of G.B., the continuing inability of any of the searchers to find her, and the then-recent discovery that the vehicle upon which she had been riding on the morning of her disappearance had been purposely hidden in order to avoid its discovery. Further, as the suppression court found as an unchallenged fact, G.B.'s ATV was intentionally hidden "under a medium that was under the primary control of [Appellant]," namely manure. Suppression Court Opinion, dated 12/28/07, at 9; *see also id.* at 3, Finding of Fact No. 15 ("The officers had previously learned that among [Appellant's] duties at the Montgomery farm was the collection and spreading of manure.").

These facts would lead a person of reasonable caution to conclude that Appellant was *probably* involved in the felonious disappearance of G.B., where her disappearance was the result of either her murder or kidnapping. As the suppression court concluded, "[t]he most reasonable inference [from these facts] is that the child had been the victim of foul play and that [Appellant] was involved K." *Id.* We would add that the most reasonable inference and possibility from the facts was that G.B.'s disappearance, with which Appellant was involved, was the result of felonious acts of the most egregious kind.

 Further, prior to Appellant's arrest, state and federal law enforcement officials were feverishly investigating the disappearance of a girl who had been missing for several days, and, therefore, time was of the essence to attempt to forestall any further harm that might befall the child. "The Fourth Amendment permits a warrantless arrest under *exigent circumstances* if based upon probable cause. The crucial test is whether there were facts available which would justify

a person of reasonable caution in the belief that a crime had been committed and that the individual arrested was the probable perpetrator." *Commonwealth v. Wilder,* 461 Pa. 597, 337 A.2d 564, 566 (1975). Certainly, when G.B.'s ATV was discovered *intentionally buried for purposes of hiding it,* and the child was still missing, the troopers at the farm were presented with exigent circumstances for making a warrantless arrest upon probable cause that Appellant had committed one of several possible crimes, including but not limited to those Trooper Schuster detailed to Appellant when he was arrested. We will not require police to temporarily abandon a search for a missing child when evidence of foul play has just been detected and leave a likely time-sensitive search in order to obtain an arrest warrant, when there is probable cause to make an arrest of an individual whom the evidence shows is criminally connected with the child's disappearance.

Accordingly, because there was probable cause to believe that Appellant was involved in the felonious disappearance of G.B., his warrantless arrest was lawful, and the conclusion of the suppression court that Appellant had been lawfully arrested must be upheld. Further, because Appellant's arrest was lawful, there is no basis for his secondary argument here that the statements made to the police following his arrest were tainted as a result of an illegal seizure and should have been suppressed.

### B. Statements and Confession

In this portion of his argument, Appellant contends that, even if it is determined that he had been lawfully arrested, certain statements he made to the police, including his confession, were procured in violation of his rights under the Fifth and Sixth Amendments to the United States Constitution and Article 1, Section 9 of the Pennsylvania Constitution.

Appellant acknowledges that he was given his *Miranda* warnings after his arrest and credits Trooper Schuster for breaking off all questioning once Appellant stated that he needed to consult with a lawyer before he answered any more questions. Appellant's Brief at 30. Appellant also admits

that it was *he* who had re-initiated further communication with the police when he said to the constable standing near the vehicle in which Appellant sat, that he could save the police some time because G.B. was not in the area where the ATV had been found. *Id.* at 30–31; *see also* N.T. Suppression Hearing at 142–43.

Appellant's specific contention here is that during the immediately *subsequent* encounter with the troopers at a quiet area of the farm where he had been taken, his refusal to sign a written waiver of rights should have been construed as "an unambiguous re-assertion of his wish for counsel before proceeding with any custodial interrogation." Appellant's Brief at 31. Appellant asserts that any further questioning should have then ceased.

Appellant acknowledges that following his refusal to sign the written waiver, he did, without prompting, commence to tell the troopers that a man in a white truck had asked him to help dispose of the ATV. However, Appellant asserts that these statements, that could possibly be viewed as a re-initiation of contact with the police, could not be interpreted as a *voluntary or valid* re-initiating of communication. This is "[b]ecause the authorities [had] placed him in circumstances that drained his powers of resistance to suggestion, and undermined his self-determination," so that "there was no knowing, voluntary, or intelligent waiver" of his rights. *Id.*, citing *Commonwealth v. Jones,* 546 Pa. 161, 683 A.2d 1181 (1996), but without citation to the record, the suppression court's factual findings, or the suppression court's legal conclusions.

Appellant alleges the following, again without any citation to the record, as indicia of an environment that prevented him from making a knowing, voluntary, or intelligent waiver of his constitutional rights:

> [Appellant] was kept at the scene, under the guise of "other matters to attend to," for no reason other than to work on his ability to exercise free-will and self-determination. In *Commonwealth v. Cornelius,* 856 A.2d 62 (Pa.Super.2004),

the [c]ourt found that the police violated Cornelius'[s] 6th Amendment right to counsel by driving him around the scene of the crime and related areas in a deliberate attempt to elicit inculpatory statements.

[Appellant] was kept shackled in the backseat [sic] of the car he was brought to the scene in for hours with temperatures near 90, guarded by the authorities, and not brought water until he asked for some in exchange for giving some more information to the police. In the car were leaflets with the victim's photo and the plea to help with any information about her. He was previously physically confronted by Sergeant Kolson, and had been working at physical labor since 6:30 that morning, having had little sleep the night before from delay at the FBI interrogation. Finally, [Appellant] could not read or write that well, as evinced by his later wish to make a spoken statement. Under no interpretation could any valid waiver be drawn from these circumstances. . . .

Appellant's Brief at 32–33.

The Commonwealth denies that Appellant's Fifth and Sixth Amendment rights were violated.[7] The Commonwealth notes that the suppression judge found that: (1) Appellant had been given his *Miranda* rights after his arrest and prior to any police questioning; (2) police questioning of Appellant ceased when Appellant stated that he believed he needed an attorney; (3) Appellant subsequently initiated contact when he stated to the constable standing near him that G.B. was not with the recently discovered ATV; (4) even though Appellant thereafter refused to sign a written waiver of his rights, he subsequently freely and voluntarily talked to and eventually cooperated with the police, leading to his statement to the police that they would need a backhoe to find G.B.'s body and his showing the police where the girl's helmet and shoes could be found; and (5) Appellant freely elected to make a statement to the

7. Once again, the Commonwealth also maintains that Appellant has not presented an argument that comports with the applicable standard of review because it does not identify any suppression court finding of fact that is challenged or conclusion of law derived from such facts that is erroneous.

police after he once again was given his *Miranda* rights after being taken to the police station. Commonwealth's Brief at 23–24.

The Commonwealth then notes that the suppression judge relied on *Commonwealth v. Edwards,* 588 Pa. 151, 903 A.2d 1139 (2006), in support of his ruling to deny Appellant's request to suppress his statements and confession. In that case, we relevantly held that a confession given after the defendant invokes his rights to counsel need not be suppressed where the defendant initiates further contact with the police and makes a knowing and intelligent waiver of his or her right to counsel. *Id.* at 1150. Here, the suppression judge found that, although Appellant had initially invoked his right to counsel, he thereafter initiated contact with the police and made statements wholly free of police harassment and intimidation, thus making a knowing and voluntary waiver of his right to counsel "at every occasion on which he volunteered information to the officers." Commonwealth's Brief at 25, quoting Suppression Court Opinion at 15. For these reasons, the Commonwealth asserts that Appellant's constitutional claims are without merit.

 The test for determining the voluntariness, and thus the admissibility, of an accused's statement is the totality of the circumstances surrounding the statement. *Perez,* 845 A.2d at 787. The mere fact that there is some passage of time between when an accused is arrested and when he or she gives an inculpatory statement does not constitute grounds for suppression of the statement. *Id.* Numerous factors should be considered under a totality of the circumstances test to determine whether a statement was freely and voluntarily made: the means and duration of the interrogation, including whether questioning was repeated, prolonged, or accompanied by physical abuse or threats thereof; the length of the accused's detention prior to the confession; whether the accused was advised of his or her constitutional rights; the attitude exhibited by the police during the interrogation; the accused's physical and psychological state, including whether he or she was injured, ill, drugged, or intoxicated; the conditions attend-

ant to the detention, including whether the accused was deprived of food, drink, sleep, or medical attention; the age, education, and intelligence of the accused; the experience of the accused with law enforcement and the criminal justice system; and any other factors which might serve to drain one's powers of resistance to suggestion and coercion. *Id.* at 785, 787.

Further relevant to our inquiry is the body of law concerning a defendant's invocation of his constitutional rights while in custody. In *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the United States Supreme Court declared that an accused has a Fifth and Fourteenth Amendment right to have counsel present during custodial interrogation, so as to ensure that the defendant's right against compulsory self-incrimination is protected. In *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the High Court revisited its holding in *Miranda* and adopted a prophylactic rule that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards,* 451 U.S. at 484, 101 S.Ct. 1880. The High Court explained that an accused, "having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.*" *Id.* at 484–85, 101 S.Ct. 1880 (emphasis added). The purpose behind this rule is "to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey,* 494 U.S. 344, 350, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990).

The U.S. Supreme Court has held that in order "[t]o avoid difficulties of proof and to provide guidance to officers conducting interrogations," the determination of whether the right to counsel was invoked by the accused is an "objective inquiry." *Davis v. United States,* 512 U.S. 452,

458–59, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). Effective assertion of the Fifth Amendment right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney in dealing with custodial interrogation by the police." *McNeil v. Wisconsin,* 501 U.S. 171, 178, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991) (emphasis omitted); *see also Commonwealth v. Fears,* 575 Pa. 281, 836 A.2d 52, 61 (2003) (quoting *McNeil* ). However, if the accused makes an *ambiguous or equivocal reference* that would lead an officer, in light of the circumstances, to believe "only that the suspect *might* be invoking the right to counsel," police interrogation *need not cease. Davis,* 512 U.S. at 459, 114 S.Ct. 2350 (emphasis in original). The accused must "articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.*

In *Davis,* the defendant stated during an interrogation conducted by police concerning a murder, "Maybe I should talk to a lawyer." *Id.* at 455, 114 S.Ct. 2350. Unsure as to whether the comment constituted an invocation of the right to counsel, the officers asked the defendant whether he was requesting a lawyer, to which he responded, "No, I'm not asking for a lawyer." *Id.* The interrogation resumed, and the defendant made incriminating statements. Thereafter, the defendant said, "I think I want a lawyer before I state anything else," *id.,* and the questioning ceased.

The relevant issue in *Davis* was whether the defendant had invoked his right to counsel when he stated, "maybe" he should talk to a lawyer, but thereafter clarified that he was "not asking for a lawyer." The High Court declined the defendant's invitation to extend *Edwards* and require law enforcement officers to cease questioning immediately upon the making of an ambiguous or equivocal reference to an attorney, because such a ruling would needlessly serve as an obstacle to legitimate police investigative activity. *Id.* at 459–60, 114 S.Ct. 2350. The High Court ruled, instead, that unless the suspect *actually requests* an attorney, questioning may

continue. *Id.* at 462, 114 S.Ct. 2350. Although stating that it would be "good practice" for police to further question the accused to clarify ambiguous references to counsel, the High Court specifically declined to adopt a rule requiring officers to ask clarifying questions. *Id.* at 461–62, 114 S.Ct. 2350. Emphasizing that the lower courts had construed "Maybe I should talk to a lawyer" as not constituting a request for counsel, the Supreme Court saw no reason to disturb that conclusion. *Id.* at 462, 114 S.Ct. 2350.

▇ We conclude that the above authority contradicts Appellant's argument that his refusal to sign a written waiver of rights without first consulting an attorney should have been construed as "an unambiguous re-assertion of his wish for counsel before proceeding with any custodial interrogation." Appellant's Brief at 31.[8] Appellant did not actually request an attorney; at most, Appellant's statement would lead the troopers to believe only that Appellant *"might* be invoking the right to counsel." *Davis,* 512 U.S. at 459, 114 S.Ct. 2350 (emphasis in original). Therefore, their interrogation *need not have ceased,* in accordance with this established authority. *See id.*

Moreover, as the suppression court found here, based on the Commonwealth's evidence of record, it was Appellant who then *immediately* made statements to the police, albeit false ones, concerning a "fat guy" in a white truck who had offered him $100 to help dispose of the ATV. Suppression Court Opinion, filed 12/28/07, at 5 (Finding of Fact No. 37) and 12.

▇ Appellant's subsequent statements regarding his willingness to show the troopers where G.B.'s helmet and shoes were buried and, later, where G.B. herself was buried, did come after pleas from the troopers to help them locate the missing girl. *Id.* at 6 (Findings of Fact Nos. 42–44). However, as noted, these statements were not made after an unambiguous request for counsel when Appellant refused to sign

8. Again, Appellant's statement was made during the encounter following his having been taken by the State Police to a quiet area of the farm after, by his own admission, he had initiated contact with the authorities by stating that he could save the police and the searchers time because G.B. would not be found with the ATV.

the waiver of rights form, as there was no such unambiguous request. Further, the record supports the suppression court's determination that it was Appellant who, in the interim between his refusal to sign the waiver of rights form and his statements concerning the locations of G.B.'s helmet, shoes, and body, had initiated contact with the troopers of his own accord.

Appellant's argument is also based on assertions that he was (1) kept by the officers at the scene for no other reason than "to work on his ability to exercise free-will and self-determination;" (2) kept "shackled" in the back seat of a car with near 90 degree temperatures; and (3) brought water only "in exchange for giving some more information to the police." Appellant's Brief at 32. Aside from the evidence that Appellant had been handcuffed, with accommodation made for a sore shoulder that Appellant had mentioned to the officers, and kept at the scene in the back seat of a police car in the shade, during a very warm and humid evening, there is nothing in the record to support Appellant's bald assertions that he was kept at the scene to "work" his "free-will and self-determination" or that he was given water only in exchange for information; Appellant has failed to cite to any evidence in the record that might remotely support such charges. On the contrary, the evidence given by the Commonwealth shows that Appellant was given water when he requested it and that the windows in the vehicle in which he sat were lowered when he stated that he was hot. N.T. Suppression Hearing at 131–32, 138–39, 142–43.

Appellant also suggests that there was undue coercion placed upon him by the fact that leaflets picturing the missing girl were present in the police car in which he sat; however, he cites no authority which establishes that this circumstance constituted a legal impropriety, much less one of constitutional proportion. Further, Appellant suggests that his earlier confrontation with Sergeant Kolson, who had jabbed his fingers into Appellant's chest, together with his long day of physical labor following questioning the evening before by the FBI, and his purported deficiencies with reading and writing, all

created an atmosphere that rendered his statements involuntary and thus invalid. *See* Appellant's Brief at 32–33.

However, we discern nothing in Appellant's arguments, to the very limited extent that they consist of factual matters that actually exist in the record, nor do we discern anything from the suppression court record as a whole, that would establish, under the totality of the circumstances, that Appellant's statements were in any way coerced or otherwise improperly obtained.[9] Taking note of the factors set forth in *Perez* and other cases, we conclude: (1) police questioning here was not prolonged or accompanied by physical abuse or threats thereof, nor was it unduly repetitious;[10] (2) Appellant's detention prior to his confession was not unduly long under the particular circumstances here, nor is there any evidence to suggest that Appellant was detained for the purpose of forcing a confession; (3) Appellant was repeatedly advised of his constitutional rights; (4) the attitude exhibited by the troopers during the interrogation was not offensive to constitutional norms;[11] (5) Appellant was not injured, ill,

9. Appellant did testify at the suppression hearing; however, his testimony regarding rough or inappropriate treatment at the hands of the FBI and the state troopers is contradicted by the extensive evidence provided by the Commonwealth. As noted, in our review of a challenge to a denial of a suppression motion, we may only consider the evidence of the Commonwealth's witnesses, and so much evidence of the defense that remains uncontradicted when fairly read in the context of the record as a whole. *Perez, supra* at 788. Here, the evidence clearly supports the suppression court's relevant factual findings; thus, we are bound by such findings. *Id.*

10. Appellant did voluntarily spend several hours the evening before providing answers to questions posed by the FBI; however, he was free to stop that questioning and leave the FBI agents at any time. N.T. Suppression Hearing at 88. The record does not support what Appellant asserts here, to wit, that his time with the FBI, together with his post-arrest detention the following afternoon and evening, created a coercive environment.

11. Although Sergeant Kolson did poke Appellant in the chest with his fingers, Appellant made no statements in response to that action, and a significant period of time elapsed before Appellant volunteered statements to the police. Further, although some troopers expressed visible frustration in response to Appellant's story regarding the man in a white truck offering money to dispose of an ATV and, perhaps, for Appellant's withholding of information that could lead to G.B.'s loca-

drugged, or intoxicated; (6) Appellant was not deprived of food, drink, sleep, or medical attention, and although the weather was warm, he was detained in the evening hours and in the shade, provided with a looser form of handcuffing to accommodate his sore shoulder, and permitted at all times to sit; [12] (7) Appellant did not present any suppression hearing evidence concerning his age, education, and intelligence; and (8) Appellant had prior experience with law enforcement and the criminal justice system.[13] *See Perez, supra* at 785, 787.

With respect to the confession Appellant made at the police station on the evening of his arrest, Appellant makes no specific argument regarding the circumstances of his waiver of rights at that time or the voluntariness of his having made that statement. Rather, Appellant's arguments are centered on the events that unfolded at the farm following his arrest; however, we perceive that Appellant relies on the assertion that if not for his unlawful arrest or the otherwise improperly obtained statements, there would have been no occasion for Appellant to have been at the police station to make a confession.

Our determination, however, is that Appellant's contentions of unlawful arrest and improperly obtained statements must fail. Accordingly, Appellant is entitled to no relief under his Issue VI.

## SUFFICIENCY OF EVIDENCE OF RAPE AND SEXUAL ASSAULT (Appellant's Issues I–IV)

 Appellant's first four stated issues all relate to his contention that there was insufficient evidence to support his

---

tion, the troopers thereafter apologized, and the record is devoid of evidence that Appellant was badgered into making statements. Indeed, the Commonwealth's evidence shows that when the troopers became frustrated with Appellant, they left the vehicle in which he was seated. *See* N.T. Suppression Hearing at 185.

12. Indeed, although Appellant complains about the heat, it was not a weather condition to which he was unaccustomed: his job involved physical labor in such weather conditions and at the very site of his detention prior to being taken to the police station.

13. *See* N.T. Suppression Hearing at 210–12, indicating, among other things, Appellant's previous criminal encounter involving his arrest for driving under the influence.

convictions for rape of a child, statutory sexual assault, and sexual assault because there was no DNA evidence that would support such convictions and because the medical examiner could not state with absolute certainty that Appellant had penetrated G.B.'s vagina with his penis.[14]

Appellant's argument is properly premised upon the element of each of these three crimes that requires an act of "sexual intercourse." 18 Pa.C.S. § 3121(c) (rape of a child); 18 Pa.C.S. § 3124.1 (sexual assault); 18 Pa.C.S. § 3122.1 (statutory sexual assault).[15] In turn, sexual intercourse is defined by statute in the following manner: "In addition to its ordinary meaning, includes intercourse per os or per anus, with some penetration however slight; emission is not required." 18 Pa.C.S. § 3101. Central to his argument, Appellant emphasizes that we have held that digital penetration of the vagina does *not* fall under the statutory definition of "sexual intercourse" or "deviate sexual intercourse" and thus, for example, is not sufficient to support a charge of sexual assault. *See Commonwealth v. Kelley*, 569 Pa. 179, 801 A.2d 551, 555–56 (2002).

 "The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Commonwealth v. Ratsamy*, 594 Pa. 176, 934 A.2d 1233, 1235

14. We note that this is Appellant's *present* contention. During his closing argument at the penalty phase of trial, Appellant's counsel stated to the jury: "There's one point we can begin with agreement, [Appellant] killed [G.B.] in the commission of a rape. That's an aggravating factor." N.T. Penalty Phase, 5/9/08, at 323; *see also id.* at 333 ("Now, this was the rape and killing of a 12–year–old child.") and 334 ("[Appellant] raped and killed [G.B.] and it was done in a matter of minutes to one hour, a matter of seconds maybe."). Additionally, Appellant does not challenge, and has not challenged, the sufficiency of the evidence supporting his convictions for aggravated indecent assault of a child (18 Pa.C.S. § 3125(b)), which is also a felony, and for abuse of corpse, a misdemeanor of the second degree. 18 Pa.C.S. § 5510. Appellant's first four issues encompass both guilt and penalty phase issues.

15. Later amended by the Act of Dec. 20, 2011, P.L. 446, effective Feb. 21, 2012.

(2007), quoting *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Rather, a court must determine simply whether the evidence believed by the fact-finder was sufficient to support the verdict. *Id.* at 1236. Where the victim of sexual crimes is dead, circumstantial evidence may be used to prove the offenses. *Commonwealth v. Miller*, 555 Pa. 354, 724 A.2d 895, 901 (1999). The opinion of a medical expert witness rendered to the requisite degree of certainty is itself evidence. *Commonwealth v. Meals*, 590 Pa. 110, 912 A.2d 213, 223–24 (2006).

Appellant was convicted of four sexual crimes: rape, sexual assault, statutory sexual assault, and aggravated indecent assault of a child. As noted by Appellant, all but the latter require that the Commonwealth prove that there had been sexual intercourse (or deviate sexual intercourse) between the perpetrator and the victim. Appellant challenges the first three convictions because he contends that there was insufficient evidence of sexual intercourse. In *Kelley, supra*, we held that the statutory definitions of "sexual intercourse" and "deviate sexual intercourse" include vaginal intercourse, anal intercourse, oral intercourse, and penetration by a foreign object, but not digital penetration. *Id.* at 556. Here, because there was testimony from Dr. Wecht that evidence of the intrusion into G.B.'s vagina shortly before her death could have been caused by a finger, Appellant contends that the evidence was insufficient to prove sexual intercourse and, hence, insufficient to prove the crimes of rape, sexual assault, and statutory sexual assault. Appellant further emphasizes that there was no Commonwealth eyewitness to the sexual attack, and Appellant did not confess to raping or sexually assaulting G.B., although he did confess to strangling her.

Appellant misapprehends the nature of the appropriate standard of review as well as the impact of the totality of the evidence presented here.[16] Here, the evidence consisted of

16. Appellant also incorrectly asserts that Dr. Wecht had refused to opine to a reasonable degree of medical certainty that the injury inside G.B.'s vagina had been caused by a penis. Rather, Dr. Wecht indeed rendered just such an opinion, based not only on the nature of the

more than a fresh injury to G.B.'s vagina that is consistent with the statutory definition of sexual intercourse. The evidence also consisted of Appellant's confession that he had strangled G.B. because she had stated to him that she would tell her parents that he had just molested her. Additionally, G.B.'s body was found with her jeans pushed down to her ankles and her panties pushed down her legs, exposing G.B.'s vagina. She had died by *manual* strangulation, an act accomplished by the application of a tremendous amount of hand strength to her throat.

 Dr. Wecht opined "with reasonable medical certainty, not absolute certainty but with reasonable medical certainty, that the most likely instrumentality or object that would have produced [the] injury would have been a penis," based on the coinciding evidence that G.B.'s jeans and panties had been pulled down and that she had died by manual strangulation. N.T. Trial, 5/1/08, at 421–23. Although Dr. Wecht could not foreclose the possibility that a finger had caused the injury, this concession at most only presented the jury with a determination to be made regarding what had happened. Arguments centered, as here, on aspects of a medical expert witness's testimony brought out on cross-examination that might arguably weaken the expert witness's conclusions go to the weight of the evidence, not its sufficiency. *Meals, supra* at 222–24. On a sufficiency of the evidence challenge, a reviewing court is limited to determining whether the evidence—here, an expert witness's testimony—when viewed in a light most favorable to the prevailing party, supports the verdict. *Id.* at 222.

 Along these lines, "[a]ny doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances." *Ratsamy, supra* at 1236 n. 2. We hold here that the evidence of penetration by Appellant's penis was not so weak

injury, but also on the surrounding evidence. N.T. Trial, 5/1/08, at 421–23.

and inconclusive that as a matter of law no probability of fact could be drawn from the combined circumstances.[17]

In *Commonwealth v. Thomas*, 448 Pa. 42, 292 A.2d 352 (1972), the record evidence suggested that the zipper of the deceased's dungarees was partially ripped off, the thigh portion of the dungarees was torn on both sides of the crotch seam, and the victim's panties were ripped across the crotch seam. The medical examiner testified that there were tears in the victim's rectum, injuries that were *consistent* with the introduction of a penis into that area. The test results of smears taken from the vagina of the deceased were strongly positive for acid phosphatase, which is indicative of the presence of semen. The medical examiner further testified that the injuries had occurred near the time of death. We held that this circumstantial evidence "was sufficient to raise the reasonable inferences that the deceased had been raped or that rape had been attempted by the appellant at or near the time of death." *Id.* at 355.

Similarly, in this case, the reasonable inferences from the circumstantial evidence presented to the jury were that Appellant had raped and sexually assaulted G.B. prior to her death. The jury could have concluded from direct evidence, as well as the reasonable inferences flowing therefrom, beyond a reasonable doubt, that G.B. had not been digitally molested; that is, G.B. had been manually strangled and apparently died while her pants and panties were pushed down her legs, during

17. We distinguish the instant case from *Commonwealth v. Brown*, 551 Pa. 465, 711 A.2d 444, 450 (1998), wherein the evidence, even when viewed in the light most favorable to the Commonwealth, showed that someone penetrated the victim's anus with a penis or an object similar to a broom handle, establishing at best a fifty percent likelihood that the defendant had raped the victim with his penis. We held that such evidence was not sufficient, as a matter of law, to establish the defendant's guilt of rape beyond a reasonable doubt, citing *Commonwealth v. Wiley*, 288 Pa.Super. 397, 432 A.2d 220 (1981) (in turn, holding that identification testimony that a robbery victim was fifty percent certain that the defendant was the perpetrator is insufficient to sustain the defendant's conviction). In the instant case, the evidence did not present to the jury only a fifty percent probability that G.B.'s vaginal injury was caused by a penis, or a fifty percent probability that the injury was caused by a finger or other object.

which time Appellant's hands were occupied by the act of killing G.B. rather than by the act of inserting themselves into G.B.'s vagina. Notably, the injury to G.B.'s vagina had occurred prior to her death.

Accordingly, Appellant's first four issues fail, as they are all premised on the insufficiency of evidence of rape, sexual assault, and statutory sexual assault.[18]

**VERDICT AS DENIAL OF RIGHT TO DUE PROCESS AND FAIR TRIAL (Appellant's Issue V) and MANDATORY REVIEW OF DEATH SENTENCE**

In this under-developed argument, where no citation is made to any analogous authority, Appellant broadly asserts:

The imposition of the death penalty under the circumstances of this case is cruel and unusual punishment under the United States and Pennsylvania Constitutions, and contrary to the laws and procedures in the Commonwealth of Pennsylvania. The death sentence was the product of passion, prejudice, and/or arbitrary factors; and/or (ii)[sic] the evidence fails to support the finding of at least one aggravating circumstance. *See* 42 Pa.C.S. § 9711(h)(3).

Appellant's Brief at 20–21.

Appellant then proceeds to argue that the penalty-phase jury was subject to erroneous or prejudicial statements or instructions from both the prosecutor and the trial judge that "unfairly tilted the balance toward death [and] away from life." *Id.* at 22. Specifically, Appellant notes that the prose-

18. We also note that the record confirms the Commonwealth's contention that Appellant failed to object to the trial court's permitting the penalty-phase jury being tasked with considering the aggravating factor of whether Appellant had committed murder in perpetration of a felony. Rather, Appellant objected to this aggravator premised only on the contention that the trial court, during the guilt phase of trial, should have granted his motion to permit the jury to consider a verdict of felony murder instead of first-degree murder, and thus the trial court had erred by *then* denying such relief. Appellant did, however, directly object to the jury's consideration of the other aggravator asserted by the Commonwealth, to wit, that Appellant had killed the victim in order to prevent her from testifying as a prosecution witness against Appellant in regard to his commission of a felony. *See* N.T. Penalty Hearing, 5/8/08, at 10–16; and 5/9/08, at 366–67.

cutor stated in her opening remarks to the penalty-phase jury that the "cloak of innocence" had been "removed" from Appellant as a result of his conviction. *Id.* at 21. Appellant counters that he had a " 'presumption' of life imprisonment" until the Commonwealth "proves aggravating circumstances to the standard of evidence required to remove" this "presumption." *Id.* Further, Appellant asserts that he had a legal and constitutional "cloak of innocence" regarding "whether he committed acts sufficient to warrant death even in his penalty phase proceeding." [19] *Id.*

Appellant also asserts that the "manner" by which the trial judge charged the penalty-phase jury was erroneous. *Id.* Appellant asserts that the trial judge should have "first inform[ed]" the jury "that the penalty for first-degree murder can be life or death. Instead[,] the court began with instructions related to death implicitly [sic] directed the jury to consider death first or life [sic] and instructing the jury that their sentence **must** be a sentence of death if it is unanimously agreed that aggravating circumstances outweighed mitigating circumstances. Such an instruction incorrectly shifts the burden to the defendant." *Id.* (emphasis in original). Although Appellant cited to a page number of the transcript in support of this argument, he did not cite to any legal authority that might support these assertions.[20]

The Commonwealth argues that because the evidence supports the two aggravating factors raised by the Commonwealth, including Appellant's own admission that he had killed G.B. to prevent her from telling her parents that he had molested her, the jury's imposition of the death penalty was the result of rational consideration. The Commonwealth fur-

---

**19.** Appellant does not cite to any provision of Pennsylvania law nor identify any specific (or general) constitutional provision as authority for this assertion.

**20.** Finally, Appellant notes that the trial judge instructed the jury that a death sentence could be commuted to a life sentence, but that commutation is a rare occurrence. Appellant apparently considers this charge incorrect or inadequate because Appellant asserts, without further argument or any citation to authority, that no capital defendant has had his or her death sentence commuted to life imprisonment "within the last 40 + years." Appellant's Brief at 21–22.

ther contends that because Appellant has failed to cite to any specific constitutional provision or case law to support his claims that his sentence violated the United States and Pennsylvania Constitutions, his constitutional claims are waived.

We agree with the Commonwealth that Appellant has failed to fully develop his constitutional claims, placing them in jeopardy of waiver. *See Commonwealth v. Briggs*, 608 Pa. 430, 12 A.3d 291, 342–43 (2011). However, we view Appellant's arguments, sparse as they are, more pointedly as contending that the statutory grounds for the imposition of the death penalty have not been met for the reasons stated, namely, incorrect and prejudicial statements made by the prosecutor to the jury and by the trial judge in his instructions to the jury.

In any event, this Court is statutorily required to review the imposition of the sentence of death. 42 Pa.C.S. § 9711(h)(1). That is, we must affirm the sentence of death unless we determine:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor; or

(ii) the evidence fails to support the finding of at least one aggravating circumstance specified in [42 Pa.C.S. § 9711(d)].

42 Pa.C.S. § 9711(h)(3).

■■ Contrary to Appellant's claims, the record discloses no indicia of arbitrariness and does not suggest that the sentence of death was the product of passion or prejudice. Rather, the sentence was based upon sufficient evidence that Appellant intentionally killed G.B. Additionally, the sentence is in compliance with the statutory mandate for the imposition of a sentence of death where one or more aggravating circumstances are found to outweigh any mitigating circumstances. 42 Pa.C.S. § 9711(c)(1)(iv). The record shows that the jury balanced the two aggravating circumstances against one statutory mitigating circumstance (which, as the trial judge noted to the jury and the jury found, consisted of several sub-considerations), and determined that the aggravating circum-

stances outweighed the mitigating circumstance. Therefore, there is no ground to vacate the sentence pursuant to 42 Pa.C.S. § 9711(h)(3)(i).

More specifically, the Commonwealth asserted two aggravating circumstances: committing murder to prevent testimony in a possible criminal proceeding regarding a felony, and committing a killing in perpetration of a felony. Appellant confessed to killing G.B. in order to prevent her from telling her parents that he had molested her; therefore, the evidence supports the jury's finding of the first aggravator. Appellant was also convicted of four felonies: rape of a child, statutory sexual assault, sexual assault, and aggravated indecent assault of a child, all for acts connected to and committed immediately before the killing. As previously discussed, Appellant does not challenge his conviction for aggravated indecent assault of a child, and the evidence supports his conviction of the other three felonies. Hence, the evidence supports the jury's finding of the second aggravating circumstance as well.

During the penalty phase, Appellant put forth extensive testimony regarding his character, background, and mental deficits, from siblings, a veterinarian who had worked with Appellant in conjunction with his farm duties, a prison counselor, a prison teacher, a prison pastor, a forensic psychologist, a state trooper, and a private investigator (the latter two concerning medical records connected with a serious boyhood accident in which the back of Appellant's head was badly injured and which resulted in Appellant spending several months in either leg casts or a body cast). The Commonwealth then presented the testimony of a psychiatrist to rebut Appellant's evidence of psychiatric impairment.

Following the arguments of counsel, the trial judge then instructed the jury on the law, including a thorough discussion of the aggravating and mitigating factors at play, and the jury's statutory duty. The trial judge described to the jury the various factors that could be considered by them as mitigating circumstances, without being limited to considering

only those named factors if the evidence justified the existence of others. N.T. Penalty Phase, 5/9/08, at 346–48.[21] The jury returned a verdict of death after finding and balancing the Commonwealth's two aggravating factors against Appellant's mitigating factor of "character and record." Verdict Slip, Docket Entry No. 82, at 3–4.

■ Here, Appellant contends that the jury was predisposed to give a verdict of death because of an alleged erroneous jury instruction, which purportedly shifted "the burden to [Appellant]." Appellant's Brief at 21, citing N.T. Penalty Phase, 5/9/08, at 360. However, the transcript page cited by Appellant records only the trial judge's instruction as to how to fill in the verdict slip, with regard to the potential circumstance that the jury could find at least one aggravating circumstance and one mitigating circumstance, and could further find that the aggravating circumstance(s) outweighed the mitigating circumstance. Plainly, this instruction shifted no burden and is in conformance with the statutory requirements concerning the proper sentencing procedure for murder of the first degree. *See* 42 Pa.C.S. § 9711(c) (pertaining to "Instructions to jury"). Further, there is nothing in the record indicating that Appellant had objected to this aspect of the trial judge's instructions, except to the extent that Appellant disputed the existence of aggravating circumstances.[22]

21. The trial judge noted that these factors fell under one enumerated statutory mitigating circumstance, namely 42 Pa.C.S. § 9711(e)(8). The factors described by the judge, which were also set forth on the verdict slip were: low average intelligence, failure to complete special education, history of alcohol addiction and drug abuse, childhood traumatic injury, lack of adequate and nurturing parenting, alcoholic parents, childhood poverty and ridicule, abusive family environment, victim of abuse by strangers, prior good work record, mood and personality disorders, history of depression and suicidal ideation, and adaptability to prison. N.T. Penalty Phase, 5/9/08, at 347–48; Docket Entry No. 82.

22. Appellant also contends that he was prejudiced by the trial judge's instruction that there existed the possibility that Appellant's sentence of death, should such a sentence eventuate, could be commuted. Appellant did not object to this instruction, and the trial judge's instruction correctly stated that the possibility of commutation fell under the category of rare events. There are no grounds articulated by Appellant that would support his suggestion that his death sentence violated

■ Appellant also contends that the jury was predisposed to sentence him to death based on the prosecutor's opening remark that the "cloak of innocence" had been "removed" from Appellant as a result of his conviction. Appellant's Brief at 21, citing N.T. Penalty Phase, 5/8/08, at 22. Here is what the prosecutor stated, in context:

> This [the penalty phase] is a separate part of the trial. When you were called to jury duty[,] you were asked certain questions about your ability to go through a penalty phase if and when you found [Appellant] guilty of first[-]degree murder.
>
> You have reached that verdict, the cloak of innocence has been removed.
>
> This is a different procedure, because at this point in the proceedings[,] [Appellant] is now deemed a murderer, guilty of killing [G.B.] with malice and with the intent to kill. We have now moved on to a very different, a very solemn proceeding, a proceeding to determine whether [Appellant] will be receiving a sentence of life imprisonment or death for the killing of [G.B.].

N.T. Penalty Phase, 5/8/08, at 22–23.

Appellant did not object to these statements, and thus his issue is waived. As this Court recently observed regarding waived penalty-phase claims:

> [T]his Court has repeatedly declined to address defaulted penalty phase claims under the rubric of statutory review for arbitrary factors. *See Commonwealth v. Padilla* [622 Pa. 449] 80 A.3d 1238, 1272 (Pa.2013) (declining to invoke this Court's Section 9711(h)(3)(i) statutory review of death sentences to address the defendant's challenge to an aggravating circumstance to which the defendant had stipulated at trial because the issue was waived and could only be pursued on collateral review as an ineffective assistance of counsel claim); *Commonwealth v. May,* 612 Pa. 505, 31 A.3d 668, 675 (2011) (refusing to invoke Section 9711(h)(3)(i)

constitutional or statutory norms because the trial judge did not state that a commutation of sentence might never happen.

statutory review to address waived penalty phase claims alleging prosecutorial misconduct and erroneous jury instructions); *Commonwealth v. Laird*, 605 Pa. 137, 988 A.2d 618, 646 (2010) (declining to address under our Section 9711(h)(3)(i) statutory review a waived claim alleging an erroneous penalty phase jury instruction because to do so would "convert statutory review into a device for resurrecting a general rule of relaxed waiver, counter to *Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385 (2003)"); *Commonwealth v. Chambers*, 602 Pa. 224, 980 A.2d 35, 58–59 (2009) (declining to review waived issues that derived from strategic decisions of the defendant's trial counsel under the guise of an "arbitrary fact" for the purposes of 42 Pa.C.S. § 9711(h)(3)'s statutory review).

*Commonwealth v. Diamond*, 623 Pa. 475, 83 A.3d 119, 136 (2013) (footnote omitted).

█ Moreover, the prosecutor here was simply relaying facts. The expression that the "cloak of innocence has been removed" is simply another way of saying that Appellant has been convicted of first-degree murder. Thus, Appellant's suggestions of unfair prejudice are unfounded. Indeed, Appellant fully disregards the salient fact that the trial judge provided the jury with a full and correct instruction, and the presumption remains that the jury faithfully followed the judge's instructions. *See Commonwealth v. DeJesus*, 580 Pa. 303, 860 A.2d 102, 111 (2004) (holding that a jury is presumed to follow the trial court's instructions). In fact, the record reveals nothing more than that this was the case here.

Contrary to Appellant's contentions, his sentence was based upon the evidence admitted at trial and is in compliance with the statutory mandate for the imposition of a sentence of death where one or more aggravating circumstances are found to outweigh any mitigating circumstances. 42 Pa.C.S. § 9711(c)(1)(iv). Furthermore, the evidence was sufficient to support the aggravating circumstances the jury found in imposing the death penalty.

For the above reasons, we conclude that Appellant's arguments lack merit and, because sufficient evidence supports Appellant's convictions and the sentence of death was not the result of "passion, prejudice, or any other arbitrary factor," but rather was based on the Commonwealth's evidence admitted at trial, the verdict and the sentence of death are hereby affirmed.[23]

Former Justice ORIE MELVIN did not participate in the decision of this case.

Chief Justice CASTILLE, Justices EAKIN, BAER and TODD join the opinion.

Justice SAYLOR files a dissenting opinion.

Justice SAYLOR, dissenting.

I respectfully dissent, since I conclude that the police lacked probable cause to arrest Appellant for any crime as of the time he was subjected to a series of custodial interrogations. While the majority makes the most out of the fact that Appellant was the person with the most legitimate, routine access to the location where the victim's all-terrain vehicle was found and the instrumentality by which it had been concealed, *see, e.g.,* Majority Opinion, at 649–51, 101 A.3d at 722–23, the fact remains that the area was an open one to which Appellant's access was non-exclusive. I also do not regard Appellant's presence alone on the farm on the day of the victim's disappearance as materially altering this assessment. Accordingly, I simply do not believe that any "reasonable inference" of Appellant's involvement either with the victim or the all-terrain vehicle rises to the level of probable cause to effectuate an arrest. While certainly the suspicions of investigating officers were legitimately aroused by the discovery of the all-terrain vehicle (or amplified, since, in fact, Appellant appears already to have been a person of interest in the investigation),

---

**23.** The Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor of Pennsylvania. *See* 42 Pa.C.S. § 9711(i).

I believe that further investigation was necessary to support an arrest, with or without a warrant.

For these reasons, I find merit in Appellant's challenge to the denial of his suppression motion and would award a new trial.