J-S48025-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| JOHNNY T. BRANFORD | |
| Appellant | No. 2018 MDA 2016 |

Appeal from the Judgment of Sentence Entered November 2, 2016
In the Court of Common Pleas of Berks County
Criminal Division at No: CP-06-CR-0002592-2015

BEFORE:  OTT, STABILE, and PLATT,[*] JJ.

MEMORANDUM BY STABILE, J.:          **FILED: DECEMBER 31, 2018**

Appellant Johnny T. Branford ("Appellant") appeals from the November 2, 2016 judgment of sentence entered in the Court of Common Pleas of Berks County ("trial court"), following his jury convictions of two counts of first-degree murder, two counts of third-degree murder, theft by unlawful taking, access device fraud, possessing instruments of crime ("PIC"), and unauthorized use of an automobile.[1]  Appellant's counsel has filed a petition to withdraw, alleging that this appeal is wholly frivolous, and filed a brief pursuant to **Anders v. California**, 386 U.S. 738 (1967), and **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009).  Upon review, we affirm the judgment of sentence and grant counsel's petition to withdraw.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2502(a), 2502(c), 3921(a), 4106(a)(1)(ii), 907(a), and 3928(a), respectively.

On January 26, 2015, a neighbor heard screams emanating from the Reading residence of Mary Branford ("Mary"), who was seventy-four years old, and her son Johnny M. Branford ("Johnny"). N.T. Trial, 9/26-30/16, at 102, 131-32, 275. Someone, in what sounded like Johnny's voice, exclaimed six or seven times, "[N]o stop, why are you doing this." *Id.* at 131-32. Subsequently, the police were called and Officer Christopher Baker performed a security check at the residence. *Id.* Officer Baker knocked on the front door and received no response. *Id.* at 135-37. He was unable to see inside the residence because the windows were covered with black trash bags. *Id.*

A few days later, Mary's other son, Joey Branford ("Joey"), was alerted of his brother Johnny's absence from work.[2] *Id.* at 161-63, 278. Following his unsuccessful efforts to contact his mother and brother by telephone and through other family members, Joey called the police to perform a "welfare check." *Id.* at 278-79.

Eventually, Sergeant Wayne Levey and Officer Christopher Gaughen of the Reading Police Department, accessed the residence through a rear basement door. *Id.* at 170-71. Once inside, Officer Gaughen was able to peer into the first floor of the residence from the door leading from the basement to the kitchen, where he observed someone's leg on the ground. *Id.* at 174. Based upon Officer Gaughen's observation, the officers decided to enter the home. *Id.* at 174, 186. Inside the residence, the officers

_____

[2] Appellant is Johnny's son and Mary's grandson.

discovered the deceased bodies of Mary and Johnny lying on the floor with blue liquid (laundry detergent) on them. *Id.* at 174. Specifically, the mouths and hands of both bodies were covered in liquid laundry detergent. *Id.* at 178, 191, 455-56. Although there were no signs of a forced entry, there were obvious signs that a struggle had taken place. *Id.* at 177, 189.

An autopsy later revealed that Mary died as a result of asphyxia caused by neck compression. *Id.* at 472. A forensic pathologist who examined Mary's body reached this conclusion based upon the presence of petechial hemorrhages on her face, eyes, mouth, and larynx as well as scleral hemorrhages in both eyes. *Id.* The time of her death was consistent with January 26, 2015, when the neighbor heard screams coming from the residence. *Id.* at 478.

Johnny was killed as a result of multiple stab wounds. *Id.* at 479. The pathologist noted that Johnny's body revealed the presence of twenty stab and ten incised wounds. *Id.* Of those wounds, five were fatal and included a wound under the left ear which transected the jugular vein in addition to wounds penetrating his heart, lungs, pancreas and spleen. *Id.* at 481-83. Johnny succumbed to his injuries at the same time Mary died. *Id.* at 484.

After the police released the crime scene, Joey entered the residence to collect important papers and items. *Id.* at 291. Joey noticed that Mary's wallet was missing from her purse, which he located in the living room. *Id.* at 292. Joey also discovered that Mary's rings were missing. *Id.* at 294. The following day, Joey called banks to close out her accounts. *Id.* at 293. In the

process, he learned of recent account activity, which he forwarded to the police. *Id.* The police eventually obtained Mary's bank records and, as a result, were able to obtain surveillance videos for a cash ATM withdrawal and two purchases made using Mary's bank cards in the days following the murders. *Id.* at 356, 58, 873-908. The surveillance footage depicted Appellant using Mary's card and her PIN number. Specifically, in the early morning hours of January 27, 2015, Appellant was recorded using Mary's debit card at a Sheetz in Muhlenberg Township, where he arrived in Johnny's Subaru. *Id.* at 361-62. Later on the same day, Appellant was recorded using Mary's card to make a purchase at Sneaker Villa. *Id.* at 363. On February 1, 2015, Appellant was captured on video using Mary's debit card at an ATM inside the Berkshire Mall. *Id.* at 365-66.

On February 5, 2015, the police responded to a "burglary in progress" at a row house in Allentown. *Id.* at 327-28. At the location, the police apprehended a male who was on the rooftop attempting to flee. *Id.* at 328. Although the male suspect provided false information to the police, he was later identified as Appellant. *Id.* at 330-31. Mary's debit card was discovered on the ground outside of the row home and turned over to the police. *Id.* at 334-35.

Following his arrest, Appellant agreed to speak to the police and denied any involvement in the killing of Mary and Johnny. Appellant asserted that Joey, his paternal uncle, gave him the bank cards and the keys to Johnny's Subaru. *Id.* at 371. Specifically, Appellant stated that Joey told him that he

was going to purchase Johnny's Subaru and directed him to drive the vehicle. *Id.* at 518-19, 524-25, 563. Appellant also stated that Joey directed him to use Mary's cards so that Joey could pay her bills. *Id.* at 522-26, 561-63. Appellant, however, conceded that Mary did not give him permission to use her cards. *Id.* at 569. Likewise, he acknowledged that Johnny did not give him permission to drive the Subaru. *Id.*

Appellant also denied being in Mary and Johnny's house in 2015. *Id.* at 557. He claimed that, as a result of an argument and altercation around Christmas Eve 2014, Johnny kicked him out of the house and obtained a protection from abuse order. *Id.* 299-300, 557.

Joey, on the other hand, stated that he did not manage Mary's finances because she handled her own affairs. *Id.* at 295. Joey stated that he did not have Mary's cards and that he did not know the PIN number to her debit card. *Id.* at 295-96. Joey further stated that he never drove his brother's Subaru and never had a conversation with him about purchasing the vehicle. *Id.* at 296. Joey denied ever having given permission to Appellant to use Mary's cards or Johnny's Subaru. *Id.* at 297. Finally, Joey stated that he did not have a key to Mary's residence. *Id.* at 292.

The police took a buccal swab of Appellant and Joey. *Id.* at 371-72. Eventually, Appellant's DNA was found under Johnny's fingernails and on the black pants Mary was wearing when she was murdered. *Id.* at 420, 425. Joey was excluded as a potential source of any of the DNA collected from the crime scene. *Id.* at 424.

Appellant was charged with and convicted by a jury of two counts of first-degree murder, two counts of third-degree murder, theft by unlawful taking, access device fraud, PIC, and unauthorized use of an automobile. On November 2, 2016, the trial court sentenced Appellant to life imprisonment on each of the first degree murder convictions.[3] Appellant did not file any post-sentence motions. Instead, he timely appealed to this Court.

Following Appellant's counseled filing of a notice of appeal, on December 6, 2016, the trial court ordered him to file a Pa.R.A.P. 1925(b) statement within twenty-one days. Appellant failed to comply. On May 19, 2017, Appellant's counsel, Jacob Gurwitz, filed in this Court an *Anders* brief. On May 24, 2017, Attorney Gurwitz filed a petition to withdraw as counsel.

On appeal, the Commonwealth correctly pointed out that at no point did Attorney Gurwitz file a Rule 1925(b) statement in accordance with the trial court's December 6, 2016 order. In response, on August 1, 2017, a panel of this Court issued a memorandum decision remanding this case to the trial court with instruction to direct Appellant to file a Rule 1925(b) statement *nunc pro tunc*.

On August 14, 2017, the trial court issued an order directing Appellant to file a Rule 1925(b) statement. On August 16, 2017, Attorney Gurwitz filed

---

[3] For purposes of sentencing, the third degree murder convictions merged with the first degree convictions. The trial court also imposed upon Appellant concurrent sentences of five years' imprisonment for theft by unlawful taking, one to seven years' imprisonment for access device fraud, one to five years' imprisonment for PIC, and one to two years' imprisonment for unauthorized use of a motor vehicle.

a Rule 1925(b) statement. On August 28, 2017, the trial court permitted Attorney Gurwitz to withdraw from the case. On the same day, the trial court issued an order appointing John Fielding, Esquire, to represent Appellant on direct appeal. On August 29, 2017, the trial court issued another order instructing Appellant to file a Rule 1925(b) statement. Following the trial court's grant of two extensions, on December 14, 2017, instead of the court-ordered Pa.R.A.P. 1925(b) statement, Attorney Fielding filed a statement of intent to file an **Anders** brief under Pa.R.A.P. 1925(c)(4).[4] On January 2, 2018, the trial court issued a two-page Pa.R.A.P. 1925(a) opinion, concluding that no meritorious issues exist for purposes of direct appeal.

Attorney Fielding, however, failed to file an **Anders** brief consistent with Rule 1925(c)(4) or an Application to Withdraw. Thus, on January 18, 2018, we issued an order, directing Attorney Fielding to file an Application to Withdraw and an **Anders** brief in this Court, or a Rule 1925(b) statement in the trial court. Eventually, after we issued additional orders over the course

_____

[4] Rule 1925(c)(4) provides:

> In a criminal case, counsel may file of record and serve on the judge a statement of intent to file an [**Anders**] brief in lieu of filing a Statement. If, upon review of the [**Anders**] brief, the appellate court believes that there are arguably meritorious issues for review, those issues will not be waived; instead, the appellate court may remand for the filing of a Statement, a supplemental opinion pursuant to Rule 1925(a), or both. Upon remand, the trial court may, but is not required to, replace appellant's counsel.

Pa.R.A.P. 1925(c)(4).

of several months,[5] Attorney Fielding finally filed the instant **Anders** brief, raising three issues for our review.

> [I.] Was the evidence adduced at trial insufficient to support the jury's verdict?
>
> [II.] Was the verdict of the trial court below against the weight of the evidence?
>
> [III.] Should ineffective assistance of counsel be an issue raised at this point in the case?

**Anders** Brief at 5.

When presented with an **Anders** brief, this Court may not review the merits of the underlying issues without first examining counsel's petition to withdraw. **Commonwealth v. Goodwin**, 928 A.2d 287, 290 (Pa. Super. 2007) (*en banc*). It is well-established that, in requesting a withdrawal, counsel must satisfy the following procedural requirements: 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) provide a copy of the brief to the defendant; and 3) advise the defendant that he or she has the right to retain private counsel, proceed *pro se* or raise additional arguments that the defendant considers worthy of the

---

[5] To review in detail the tortured procedural history of this case, we direct the reader's attention to our March 27, 2018 memorandum remanding with instructions for Attorney Fielding to comply with the minimum requirements of **Anders/Santiago**, as well as our August 27, 2018 order remanding for a hearing to determine whether Attorney Fielding had abandoned Appellant and to take further action to protect Appellant's right to appeal.

- 8 -

court's addition. ***Commonwealth v. Lilley***, 978 A.2d 995, 997 (Pa. Super. 2009).

Instantly, counsel's petition to withdraw from representation provides that counsel reviewed the record and concluded that the appeal is frivolous. Furthermore, counsel notified Appellant that he was seeking permission to withdraw and provided Appellant with copies of the petition to withdraw and his ***Anders*** brief. Counsel also advised Appellant of his right to retain new counsel, proceed *pro se*, or raise any additional points he deems worthy of this Court's attention. Accordingly, we conclude that counsel has satisfied the procedural requirements of ***Anders***.

We next must determine whether counsel's ***Anders*** brief complies with the substantive requirements of ***Santiago***, wherein our Supreme Court held:

> [I]n the ***Anders*** brief that accompanies court-appointed counsel's petition to withdraw, counsel must: (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

***Santiago***, 978 A.2d at 361. Here, our review of counsel's brief indicates that he has complied with the briefing requirements of ***Santiago***. We, therefore, conclude that counsel has satisfied the minimum requirements of ***Anders***/***Santiago***.

Once counsel has met his obligations, "it then becomes the responsibility of the reviewing court to make a full examination of the proceedings and make

- 9 -

an independent judgment to decide whether the appeal is in fact wholly frivolous." ***Santiago***, 978 A.2d at 355 n.5. Thus, we now turn to the merits of Appellant's appeal.

In his first issue on appeal, Appellant challenges the sufficiency of the evidence underlying his convictions.

"A claim challenging the sufficiency of the evidence is a question of law." ***Commonwealth v. Widmer***, 744 A.2d 745, 751 (Pa. 2000).

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the finder of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

***Commonwealth v. Antidormi***, 84 A.3d 736, 756 (Pa. Super. 2014), ***appeal denied***, 95 A.3d 275 (Pa. 2014).

The Crimes Code defines first-degree and third-degree murder as follows:

**§ 2502. Murder**

> **(a) Murder of the first degree.**—A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing.
>
> . . . . .
>
> **(c) Murder of the third degree.**—All other kinds of murder shall be murder of the third degree. Murder of the third degree is a felony of the first degree.

18 Pa.C.S.A. § 2502(a), (c).

> To find a defendant guilty of first-degree murder a jury must find that the Commonwealth has proven that he . . . unlawfully killed a human being and did so in an intentional, deliberate and premeditated manner. It is the element of a willful, premeditated and deliberate intent to kill that distinguishes first-degree murder from all other criminal homicide. ***Specific intent to kill may be inferred from the defendant's use of a deadly weapon upon a vital part of the victim's body***. The *mens rea* required for first-degree murder, specific intent to kill, may be established solely from circumstantial evidence.

***Commonwealth v. Schoff***, 911 A.2d 147, 159-60 (Pa. Super. 2006)

(internal citations omitted) (emphasis added).

> A person may be convicted of third-degree murder where the murder is neither intentional nor committed during the perpetration of a felony, but contains the requisite malice aforethought. Malice consists of a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured.

***Commonwealth v. Pigg***, 571 A.2d 438, 441-42 (Pa. Super. 1990) (internal

quotations and citations omitted). "The elements of third-degree murder, as

developed by case law, are a killing done with legal malice but without specific

intent to kill required in first-degree murder. Malice is the essential element

of third[-]degree murder, and is the distinguishing factor between murder and

manslaughter." ***Commonwealth v. Cruz-Centeno***, 668 A.2d 536, 539 (Pa. Super. 1995) (citations omitted).

> We have stated that a person may be convicted of third-degree murder where the murder is ***neither intentional*** nor committed during the perpetration of a felony, but contains the requisite ***malice*** aforethought. . . . We have defined malice as a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured. In addition, ***malice may be inferred from the use of a deadly weapon upon a vital part of the body***. Malice may also exist where the principal acts in gross deviation from the standard of reasonable care, failing to perceive that such actions might create a substantial and unjustifiable risk of death or serious bodily injury.

***Commonwealth v. Yanoff***, 690 A.2d 260, 264 (Pa. Super. 1997) (internal citations and quotation marks omitted) (emphasis added).

Instantly, our review of the record confirms that the evidence was sufficient to enable the jury to find every element of first- and third- degree murder beyond a reasonable doubt. Appellant's claim that because of a PFA he had not been to Mary and Johnny's residence since Christmas Eve 2014 fails because his DNA was found nearly a month later at the crime scene under Johnny's fingernails and on the black pants Mary was wearing at the time of her death. Further, Appellant's claim that Joey had murdered Mary and Johnny was contradicted by DNA evidence, excluding Joey as a potential suspect.[6] The record establishes that Appellant acted with the specific intent

---

[6] The trial court also was well within its authority to reject Appellant's proffered version of the facts. ***Antidormi***, 84 A.3d at 756 ("the finder of fact while

and malice in the killing of Mary and Johnny. As detailed above, Mary died as a result of asphyxia caused by neck compression,[7] and Johnny because of thirty stab wounds, five of which were fatal, including a wound under the left ear which transected the jugular vein and others penetrating his heart, lungs, pancreas and spleen. *See Commonwealth v. Nichols*, 692 A.2d 181, 184-85 (Pa. Super. 1997) ("[I]t is well settled that the use of a deadly weapon on a vital part of the body is sufficient to establish a specific intent to kill. Clearly, a specific intent to cause serious bodily injury can be inferred from the same circumstances."). Moreover, in the days following the murders, Appellant was captured on film making an ATM cash withdrawal and purchases at two different locations using Mary's bank cards. In addition, Mary's bank card was discovered at the scene of a burglary where Appellant was arrested while attempting to flee. Thus, viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence adduced at trial was sufficient to sustain, beyond a reasonable doubt, Appellant's convictions for first- and third- degree murders in connection with the killing of his grandmother and father.

_____

passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.").

[7] It is settled that "evidence of death by strangulation can be sufficient to establish the requisite intent for first-degree murder." *Commonwealth v. Martin*, 101 A.3d 706, 718–19 (Pa. 2014), citing *Commonwealth v. Pruitt*, 951 A.2d 307, 318–19 (Pa. 2008).

We next review the sufficiency of the evidence with respect to the non-homicide charges. To sustain a conviction for the crime of theft by unlawful taking, the Commonwealth must prove, beyond a reasonable doubt, that a person unlawfully took or exercised control over movable property of another with an intent to deprive them of that property. *See* 18 Pa.C.S.A. § 3921(a).

A person commits access device fraud if he "uses an access device to obtain or in an attempt to obtain property or services with knowledge that . . . the access device was issued to another person who has not authorized its use[.]" 18 Pa.C.S.A. § 4106(a)(1)(ii).

To sustain a conviction for PIC, the Commonwealth must prove that the defendant (1) possessed an instrument of crime, (2) with intent to employ it criminally. *See* 18 Pa.C.S.A. § 907(a). Under the statute, an "instrument of crime" is defined, in pertinent part, as "[a]nything specially made or specially adapted for criminal use." 18 Pa.C.S.A. § 907(d).

A person is guilty of unauthorized use of an automobile if he operates an automobile . . . of another without consent of the owner. *See* 18 Pa.C.S.A. § 3928(a).

Instantly, based upon the evidence presented at trial, viewed in a light most favorable to the Commonwealth, we agree with Attorney Fielding that the Commonwealth proved beyond a reasonable doubt Appellant committed theft by unlawful taking, access device fraud, unauthorized use of an automobile, and PIC. As noted earlier, after the police released the scene and permitted Joey to enter the residence, Joey noticed that Mary's rings and

- 14 -

bank cards were missing. He stated that Mary managed her own affairs. Joey also stated that he never possessed the bank cards in question and never granted Appellant any permission to use them. Joey remarked that he never had a conversation with Johnny about purchasing Johnny's Subaru and Joey denied ever having given permission to Appellant to drive the Subaru. Additionally, Appellant acknowledged at trial that Mary never authorized him to use her cards and that Johnny never gave him permission to drive the Subaru, which Appellant drove to Sheetz shortly after the murders. Lastly, based on the fact that Johnny suffered thirty stab wounds, the jury concluded that Appellant necessarily possessed an instrument of crime, *i.e.*, a knife or a similar sharp object. *See Commonwealth v. Keaton*, 419 A.2d 578, 580 (Pa. Super. 1980) (holding that the jury, having concluded that appellant was the slayer, and that death resulted from the infliction of a stab wound with a knife, "could logically have concluded from all the evidence that appellant had possession of a knife, and that the knife was an instrument commonly used for criminal purposes" under Section 907(a)).

Appellant next argues that his convictions were against the weight of the evidence. We, however, as Attorney Fielding points out, need not address the merits of this issue as Appellant failed to preserve it for our review. Under Pa.R.Crim.P. 607, a challenge to the weight of the evidence generally must be preserved in a post-sentence motion. "As noted in the comment to Rule 607, the purpose of this rule is to make it clear that a challenge to the weight of the evidence must be raised with the trial judge or it will be waived."

- 15 -

*Commonwealth v. Gillard*, 850 A.2d 1273, 1277 (Pa. Super. 2004), *appeal denied*, 863 A.2d 1143 (Pa. 2004). A claim challenging the weight of the evidence generally cannot be raised for the first time in a Rule 1925(b) statement. *Commonwealth v. Burkett*, 830 A.2d 1034 (Pa. Super. 2003). An appellant's failure to avail himself of any of the methods for presenting a weight of the evidence issue to the trial court constitutes waiver of that claim, even if the trial court responds to the claim in its Rule 1925(a) opinion. *Id.* Instantly, Appellant failed to challenge the weight of the evidence at sentencing. Additionally, as mentioned, he did not file any post-sentence motions. Accordingly, his weight of the evidence claim is waived.

Appellant lastly raises a claim of ineffective assistance of trial counsel. We, however, agree with Attorney Fielding that Appellant cannot raise this claim on direct appeal but must instead raise it in a PCRA petition. In *Commonwealth v. Grant*, 813 A.2d 726 (Pa. 2002), our Supreme Court held that as a general rule, defendants must wait to raise ineffective assistance of counsel claims until collateral review. Only in specific limited circumstances may a defendant raise ineffectiveness claims in post-sentence motions and on direct appeal. *See*, *e.g.*, *Commonwealth v. Holmes*, 79 A.3d 562, 563–64 (Pa. 2013) (trial court has discretion to entertain ineffectiveness claims on post-verdict motions and direct appeal where: (1) claim of ineffectiveness is apparent from record and meritorious to the extent that immediate consideration best serves interests of justice; or (2) where good cause is shown and defendant knowingly and expressly waives his entitlement to seek

subsequent PCRA review from his conviction and sentence).  These exceptions do not apply here.  Appellant did not claim ineffective assistance of trial counsel in post-verdict motions, and he did not knowingly or expressly waive his entitlement to seek subsequent PCRA review from his conviction.  At present, there is nothing in the record that facilitates intelligent appellate review of Appellant's claim of ineffective assistance.  Therefore, Appellant must wait until PCRA proceedings to raise an ineffective assistance claim. ***Commonwealth v. Britt***, 83 A.3d 198, 204 (Pa. Super. 2013) (appellant cannot seek review of ineffectiveness claim on direct appeal, "as it involves non-record-based claims, nor has Appellant waived PCRA review").

We have conducted an independent review of the record and addressed Appellant's arguments on appeal.  Based on our conclusions above, we agree with Attorney Fielding that the issues Appellant seeks to litigate in this appeal are wholly frivolous.  Additionally, we do not discern any non-frivolous issues that Appellant could have raised.  We, therefore, grant Attorney Fielding's petition to withdraw and affirm the judgment of sentence.

Petition to withdraw granted.  Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: December 31, 2018