J-S20030-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MICHAEL HARVEY LINCOLN | : | |
| | : | |
| Appellant | : | No. 1699 MDA 2024 |

Appeal from the Judgment of Sentence Entered November 7, 2024
In the Court of Common Pleas of Adams County Criminal Division at
No(s):  CP-01-CR-0000939-2023

BEFORE:  OLSON, J., LANE, J., and BENDER, P.J.E.

MEMORANDUM BY LANE, J.:                          **FILED: JULY 8, 2025**

Michael Harvey Lincoln ("Lincoln") appeals from the judgment of sentence imposed following his convictions for driving under the influence of alcohol or a controlled substance ("DUI") and obstructing the administration of law or other governmental function.[1]  We affirm.

We glean the following factual history from the evidence and testimony presented at trial.  In July 2023, Pennsylvania State Police Trooper Bradley Fornwalt ("Trooper Fornwalt") was on patrol in the early morning hours when he observed a vehicle drive past him while "touch[ing] the center line."  N.T., 8/1/24, at 5.  In response, Trooper Fornwalt activated his vehicle's equipped mobile video recorder ("MVR") and began following the vehicle at a distance of approximately eighty to 100 yards.  Trooper Fornwalt thereafter "observed [the vehicle] weaving within the lane of travel," such that it "went anywhere

_____

[1] **See** 75 Pa.C.S.A. § 3802(a)(1), 18 Pa.C.S.A. § 5101.

from touching [the center line], which it did twice, to a foot-and-a-half, two-foot off the line[.]" *Id*. at 5, 17. Based on his training and six years of experience as a state trooper, Trooper Fornwalt suspected that the driver of the vehicle was impaired and driving under the influence.

As the vehicle approached a traffic light, the trooper "observed the light turn yellow" such that he "assumed [the vehicle] wasn't going to be able to make it through" before it turned red. *Id*. at 6. When the light turned red, however, Trooper Fornwalt noted that even though "the vehicle was still completely behind the white line[,]" it continued through the intersection, nonetheless. *Id*. The trooper explained that although "a sober party would react to the yellow light" such that they would either speed up or slam on the brakes, the vehicle in this case maintained a steady speed through the intersection. *Id*. at 26-27.

Trooper Fornwalt subsequently caught up to the vehicle and initiated a traffic stop. As he approached the vehicle, the trooper could "clearly" see through the vehicle's rear window such that he knew that none of the three occupants had changed seats with the driver, Lincoln. *Id*. at 7. After the trooper explained the reason for the stop, he explained that the passengers were "very argumentative" and "disgruntled" and insisted "that the light was yellow." *Id*. The occupants also claimed that they had switched seats before the trooper approached, such that Lincoln had not been the one driving. During this interaction, Trooper Fornwalt "observed a strong odor of alcoholic beverage coming from within the vehicle[, and that Lincoln] stumbled on his

words while he was speaking." *Id*. at 8. The trooper further explained that Lincoln's "eyes were glassy and bloodshot[,]" and that he "had like a thicker voice [with] a little bit of slurring on certain words you could hear." *Id*.

When the trooper asked the occupants of the vehicle about alcohol consumption, they stated that Lincoln was the designated driver. However, outside of the vehicle Lincoln clarified "that they were at the Lincoln Speedway and . . . that he had a couple of drinks earlier in the evening." *Id*. The trooper subsequently guided Lincoln through four field sobriety tests and subjected him to a portable breath test. Throughout these tests, the trooper generally observed that Lincoln displayed difficulty with following instructions and maintaining his balance. Specifically, the trooper noted that Lincoln displayed four clue indicators of intoxication during the walk and turn test, highlighting that Lincoln started the test too soon, "stepped off the line a couple times, missed heel-to-toe a couple times[, and] lost his balance while he was in the instruction phase[.]" *Id*. at 10. The trooper additionally identified three such clues during the one-leg stand test — which he admittedly conducted for a "total of [twelve] seconds" due to Lincoln's inability to complete it — citing that Lincoln "raised his arms, . . . put his foot down before being told to do so[,] and was swaying." *Id*. As a result of the observations he had made thus far, Trooper Fornwalt ultimately "determined [that Lincoln] was unsafe to drive due to his impairment level" and placed him under arrest. *Id*. at 11.

While in the trooper's patrol vehicle, the trooper observed that Lincoln had a strong odor of alcohol emanating from his person, and that he continued

to slur his words. *See id*. at 32. Because Lincoln refused to have blood drawn to determine his blood alcohol content ("BAC"), the trooper drove him to the police station, whereupon the trooper sought and obtained a search warrant for this purpose. When transporting Lincoln to the hospital to execute the warrant, Trooper Fornwalt informed Lincoln that any refusal of a blood draw thereon would "result in an obstructing charge." *Id*. at 14. At the hospital, however, Lincoln again refused to have his blood drawn.

Police charged Lincoln with DUI, obstructing the administration of law or other governmental function, and failing to stop at a red traffic signal. Lincoln thereafter filed a motion to suppress evidence, alleging that Trooper Fornwalt effected a vehicle stop "without probable cause to believe [that Lincoln violated] the Vehicle Code . . . or reasonable suspicion of DUI." Motion for Suppression, 11/30/23, at unnumbered 1. In support, Lincoln argued that "[a] review of the [trooper's] dashcam video [revealed] that there was no weaving by [Lincoln] within his lane of travel; the vehicle never touched [or] crossed the yellow line[;] and [he] did not run a red light . . . as his vehicle entered the intersection" while the light was still yellow. *Id*. at unnumbered 1-2.

The trial court held a hearing on the motion, during which it heard testimony from Trooper Fornwalt and reviewed the MVR footage. Relevantly, Trooper Fornwalt believed that based on his observations of Lincoln's vehicle weaving, touching the road's center line twice, and maintaining a steady speed while running a red light, he "had reasonable suspicion [that Lincoln] could

have been under the influence." N.T., 12/19/23, at 10. Additionally, Trooper Fornwalt testified that he initiated a traffic stop solely because he observed Lincoln's vehicle enter into and proceed through the intersection while the light "was switched to red." *Id*. at 14.

On January 3, 2024, the trial court denied Lincoln's suppression motion, reasoning as follows:

> In the instant case, Trooper Fornwalt observed [Lincoln's] vehicle maintain a steady speed as the traffic light changed from green to yellow. Trooper Fornwalt testified that [Lincoln's] car was about at the white line designating where cars were supposed to stop, about twenty to thirty feet from the intersection, when the light turned red. Upon this court's careful review of the MVR [footage], even with the speed reduced to .25, this court cannot determine whether [Lincoln] had crossed the white line and entered the intersection before the light turned red. [Lincoln's] counsel's argument, both at hearing and in this motion, that the MVR [footage] must be played at .25 speed to ascertain [Lincoln's] position, only reinforces that it was reasonable for Trooper Fornwalt to believe that [Lincoln] ran a red light. . . . Trooper Fornwalt was [eighty] to 100 yards away from [Lincoln], and in real time it was reasonable to believe that [Lincoln] was [past] the white line and . . . in the intersection when the light turned red, and that consequently [Lincoln] committed a motor vehicle violation by running a red light. Therefore, Trooper Fornwalt had probable cause to effectuate the traffic stop.

Order, 1/3/24, at 5-6.[2] Lincoln filed a motion for reconsideration, pertinently arguing that he had been able to have the trooper's MVR footage magnified

---

[2] The trial court further clarified that in its review of the MVR footage, Lincoln's "vehicle did not weave within the lane of traffic more than an average vehicle on that road[,]" and that if Lincoln "touched the centerline, it was for no more than a couple seconds, and [he] did not jerk or overcorrect suddenly." Order, 1/3/24, at n.2. The court additionally noted that the road Lincoln was driving
*(Footnote Continued Next Page)*

and that it now "clearly shows that [his] vehicle had crossed the 'stop line' before the light turned from yellow to red." Motion for Reconsideration, 3/28/24, at unnumbered 2. The trial court denied the motion.

Following a bench trial in which the trial court again heard testimony from Trooper Fornwalt and viewed the MVR footage — including the newly-enhanced footage submitted by Lincoln — it found Lincoln guilty of DUI and obstructing the administration of law or other governmental function. The trial court acquitted Lincoln of the red-light violation, concluding that the Commonwealth's evidence was insufficient to prove the violation beyond a reasonable doubt. On November 7, 2024, the trial court imposed an aggregate sentence of twenty-four months' probation, with a restrictive ten-day term of electronically monitored house arrest. Lincoln filed a timely notice of appeal, and both he and the trial court complied with Pa.R.A.P. 1925.

Lincoln raises the following issues for our review:

1. Whether the evidence at trial was sufficient to prove beyond a reasonable doubt that [Lincoln] was incapable of driving safely after imbibing an alcoholic beverage?

2. Whether the trial court erred in denying [Lincoln's] pre[]trial motion for suppression of evidence?

Lincoln's Brief at 4 (issues reordered).

_____

on "was not particularly wide and had vehicles parked along the side." **Id**. As such, the court concluded that based on the MVR footage, "it would be doubtful that Trooper Fornwalt had reasonable suspicion of DUI to effectuate the traffic stop[.]" **Id**. at n.5.

In his first issue, Lincoln argues that the evidence was insufficient to support his conviction for DUI. A challenge to the sufficiency of the evidence presents a question of law for which our standard of review is *de novo*, and our scope of review is plenary. *See Commonwealth v. Johnson*, 236 A.3d 1141, 1152 (Pa. Super. 2020) (*en banc*). When considering a challenge to the sufficiency of the evidence:

> [W]e evaluate the record in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

> The Commonwealth may sustain its burden by means of wholly circumstantial evidence. Accordingly, the fact that the evidence establishing a defendant's participation in a crime is circumstantial does not preclude a conviction where the evidence coupled with the reasonable inferences drawn therefrom overcomes the presumption of innocence. Significantly, we may not substitute our judgment for that of the fact finder; thus, so long as the evidence adduced, accepted in the light most favorable to the Commonwealth, demonstrates the respective elements of a defendant's crimes beyond a reasonable doubt, the appellant's convictions will be upheld.

*Commonwealth v. Franklin*, 69 A.3d 719, 722-23 (Pa. Super. 2013) (quotations marks, brackets, and citations omitted). Importantly, "the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence."

*Commonwealth v. Orr*, 38 A.3d 868, 873 (Pa. Super. 2011) (*en banc*) (citations and brackets omitted).

A person is guilty of DUI if he "operates [or is] in actual physical control of the movement of a vehicle after imbibing a sufficient amount of alcohol such that the individual is rendered incapable of safely driving. . . the vehicle." 75 Pa.C.S.A. § 3802(a)(1). The elements that the Commonwealth must prove to convict a defendant of this offense are: "(1) that the defendant was the operator of a motor vehicle; and (2) that while operating the vehicle, the defendant was under the influence of alcohol to such a degree as to render him incapable of safe driving." *Commonwealth v. Donoughe*, 243 A.3d 980, 985 (Pa. Super. 2020). To prove the second element, the Commonwealth must show that alcohol substantially impaired the normal mental and physical faculties required to safely drive. *See Commonwealth v. Banks*, 253 A.3d 768, 775 (Pa. Super. 2021); *see also Donoughe*, 243 A.3d at 985-86.

Substantial impairment of the faculties necessary to safely drive is "a diminution or enfeeblement in the ability to exercise judgment, to deliberate, or to react prudently to changing circumstances and conditions." *Banks*, 253 A.3d at 775 (brackets and citations omitted). The Commonwealth can prove substantial impairment from alcohol by presenting evidence concerning the defendant's actions and behavior, including his manner of driving, performance on field sobriety tests, demeanor, physical appearance (particularly bloodshot eyes and other physical signs of intoxication), odor of

alcohol, and slurred speech. *See Commonwealth v. Segida*, 985 A.2d 871, 879 (Pa. 2009); *see also Donoughe*, 243 A.3d at 986. A police officer who observed the defendant's appearance and behavior is competent to express an opinion that the defendant was impaired by alcohol. *See Banks*, 253 A.3d at 775.

Lincoln argues that "[t]he evidence, in its totality, was insufficient to prove [his] intoxication or that he was incapable of driving safely." Lincoln's Brief at 22. He points out that "[w]hile the trooper initially generalized that [Lincoln] was 'slurring his speech,' he later clarified that there was only 'a little bit of slurring certain words.'" *Id*. Further, Lincoln posits that "[a]ny 'slight' slurring [that he did have] was caused by the use of chewing tobacco, [and] not intoxication." *Id*. at 22-23. Although the trooper "denied recalling that [Lincoln] was chewing tobacco throughout the incident," Lincoln asserts that the trooper was aware of it at the time, highlighting that the trooper inspected his tobacco container when he emptied his pockets upon exiting the vehicle, and that the "MVR [footage additionally] depicted [him] spitting out a chaw[,]" which had been "plainly visible between [his] cheek and gum." *Id*. Lincoln maintains that he also "indicated [to the trooper] that he had undergone recent neck surgery." *Id*. at 23.

Lincoln emphasizes that "[t]he [t]rooper 'saw' what he wanted to see in order to pull [Lincoln] over" even though "his 'perception' was not accurate [such that t]here was neither weaving nor clear evidence of a traffic signal violation" to justify the stop. *Id*. Moreover, Lincoln claims that he did "not

appear visibly intoxicated nor was there evidence of stumbling as the standard field sobriety tests were administered." *Id*. He clarifies that although he can be "heard wincing in pain from the handcuffs" on the way to the police barracks, he maintains that his conversation with the trooper was otherwise "cordial and cogent." *Id*. Accordingly, Lincoln avers that because "[t]he evidence failed to prove all the elements of [DUI] after imbibing an alcoholic beverage to an extent as to be rendered incapable of driving safely beyond a reasonable doubt[,]" the trial court should not have found him guilty of the crime. *Id*.

The trial court considered Lincoln's initial issue and determined that it was without merit, reasoning as follows:

> [Lincoln's] concise statement again points to the acquittal on the summary traffic charge of running a redlight as evidence that [Lincoln] was not incapable of safely driving. Such an assertion, however, ignores the clear and unequivocal testimony of the arresting state trooper.
>
> * * * *
>
> The uncontroverted trial testimony offered by Trooper . . . Fornwalt was that at the time he approached the motor vehicle [Lincoln] and the other occupants of the car had a "cover story" that the occupants of the vehicle changed seats after the stop and before the trooper approached. Trooper Fornwalt testified that he could clearly see through the back windshield of the vehicle and clearly observed that nobody switched seats and that [Lincoln] was the driver of the motor vehicle.
>
> As soon as Trooper Fornwalt approached the motor vehicle the driver and occupants were very argumentative concerning the basis for the stop and were very disgruntled. Trooper Fornwalt immediately observed a strong odor of alcoholic beverage coming from within the vehicle and noted that [Lincoln] stumbled on his

- 10 -

words while he was speaking. The trooper testified that [Lincoln] had a thicker voice with a little bit of slurring on certain words that you could hear. Trooper Fornwalt asked about alcohol consumption and originally [Lincoln] told the trooper that he was the designated driver. The trooper asked [Lincoln] to step out of the vehicle at which time [Lincoln] said he and his passengers were at Lincoln Speedway, and he had a couple of drinks earlier in the evening.

Trooper Fornwalt observed [Lincoln's] eyes to be glassy and bloodshot which was his first indication of alcohol or drug impairment. The trooper testified that a combination of the odor of alcohol, slurred speech and argumentativeness would all be potential indicators that someone was under the influence. Based on those observations Trooper Fornwalt had [Lincoln] conduct field sobriety testing which included the walk and turn test, the one leg stand, and portable breath test.

The testing was conducted on a flat roadway and during the walk and turn test the trooper testified that [Lincoln] exhibited multiple clues of impairment. Including starting too soon by just starting to walk halfway through the trooper's demonstration to the point that the trooper had to have [Lincoln] come back to the beginning, reset and restart after he finished the demonstration and explanation of the test. Yet again, [Lincoln] started before instructed to do so and before the instructions were complete. These were further clues of impairment. During the performance of the test [Lincoln] exhibited difficulty maintaining balance. In total, [Lincoln] exhibited four clues of impairment during the walk and turn test. [Lincoln] stepped off the line multiple times, missed heal to toe multiple times, started too soon and lost his balance while he was in the instruction phase.

Trooper Fornwalt then had [Lincoln] complete the one leg stand test. During that test [Lincoln] exhibited three clues. Specifically, he raised his arms, put his foot down before being told to do so and was swaying during the test. [Lincoln] only conducted the test for a total of [twelve] seconds before he could no longer complete it. The trooper testified that in his training and experience, [Lincoln's] performance on the tests was consistent with alcohol impairment. Based upon the totality of the observations made by the trooper, including the odor of alcohol, the argumentativeness, slurred speech, blood shoot and glassy eyes and the failure to complete successfully either the walk and

turn test or the one leg stand test, the trooper determined that [Lincoln] was under the influence of alcohol to a degree which rendered him incapable of safe driving.

* * * *

During the trial[,] this court observed the MVR video which allowed this court to observe the field sobriety testing and the fact that during transport after his arrest when [Lincoln] was talking his speech continued to be noticeably slurred. Further, the trooper testified that once [Lincoln] was secured in his patrol vehicle the trooper was able to definitely detect a strong odor of alcohol coming from [Lincoln']s breath. Based upon all of that evidence and all reasonable inferences drawn from that evidence, especially when viewed in the light most favorable to the Commonwealth as verdict winner, it is clear that the evidence was more than sufficient to sustain and support the conviction on the [DUI] charge . . . beyond a reasonable doubt. Accordingly, [Lincoln's] second issue has no merit.

Trial Court Opinion, 12/20/24, at 4-7 (unnecessary capitalization omitted).

Viewing the record in the light most favorable to the Commonwealth as the verdict winner, we determine that the Commonwealth met its burden of proving beyond a reasonable doubt that Lincoln was under the influence of alcohol to such a degree as to render him incapable of safely driving. *See Donoughe*, 243 A.3d at 985; *see also* 75 Pa.C.S.A. § 3802(a)(1). In the instant case, Lincoln admitted to Trooper Fornwalt that he consumed "a couple of [alcoholic] drinks" at the Lincoln Speedway earlier in the evening. N.T., 8/1/24, at 8. While assessing whether these drinks impaired Lincoln to such a degree that he was unable to safely drive his vehicle, Trooper Fornwalt ultimately concluded that he was, observing that: (1) Lincoln had a strong odor of alcohol emanating from his person; (2) his eyes were glassy and bloodshot; (3) he was slurring his words; (4) he was generally argumentative;

and (5) he failed to complete four separate field sobriety tests — due to a general lack of balance and inability to follow the trooper's instructions.

The totality of this evidence is more than sufficient to support the trial court's determination that Lincoln was not capable of safely driving as a result of his alcohol consumption beyond a reasonable doubt. *See Donoughe*, 243 A.3d at 986 n.8 (holding evidence that there was a strong odor of alcohol, and that the defendant had glassy and bloodshot eyes, moved very slowly, and failed one field sobriety test was sufficient to support DUI conviction); *see also Commonwealth v. Mobley*, 14 A.3d 887, 890 (Pa. Super. 2011) (holding that evidence that defendant failed field sobriety tests, smelled of alcohol, and had committed a traffic violation of coasting through a stop sign without coming to a full stop was sufficient support to DUI conviction); *Commonwealth v. Palmer*, 751 A.2d 223 (Pa. Super. 2000) (holding that evidence that defendant failed field sobriety tests, smelled of alcohol, had difficulty walking, had glassy and bloodshot eyes, and police officer's opinion that the defendant was impaired were sufficient to support DUI conviction). Accordingly, we conclude that Lincoln's first issue is without merit.

In his second issue, Lincoln challenges the trial court's denial of his motion to suppress evidence. Our standard of review of an order denying suppression is well-settled:

> When we review the ruling of a suppression court[,] we must determine whether the factual findings are supported by the record. When it is a defendant who has appealed, we must consider only the evidence of the prosecution and so much of the evidence for the defense as, fairly read in the context of the record

as a whole, remains uncontradicted. Assuming that there is support in the record, we are bound by the facts as are found and we may reverse the suppression court only if the legal conclusions drawn from those facts are in error.

*Commonwealth v. Hicks*, 208 A.3d 916, 925 (Pa. 2019) (citation omitted).

Our scope of review of the suppression court's factual findings is limited to the suppression hearing record. *See Commonwealth v. Barr*, 266 A.3d 25, 39 (Pa. 2021) (citations omitted). However, as an appellate court, we are not bound by the suppression court's conclusions of law. *See Hicks*, 208 A.3d at 925. Rather, when reviewing questions of law, our standard of review is *de novo*, and our scope of review is plenary. *See id*.

Relevantly, our Supreme Court has defined probable cause as follows:

Probable cause is made out when the facts and circumstances which are within the knowledge of the officer at the time of the [stop], and of which he has reasonably trustworthy information, are sufficient to warrant a man of reasonable caution in the belief that the suspect has committed or is committing a crime. The question we ask is not whether the officer's belief was correct or more likely true than false. Rather, we require only a **probability**, and not a *prima facie* showing, of criminal activity. In determining whether probable cause exists, we apply a totality of the circumstances test.

*Commonwealth v. Martin*, 101 A.3d 706, 721 (Pa. 2014) (citation omitted, emphasis in original). Pennsylvania law makes clear that a police officer has probable cause to stop a motor vehicle if he observes a traffic code violation, even if it is a minor offense. *See Commonwealth v. Bush*, 166 A.3d 1278, 1283 (Pa. Super. 2017) (citation omitted). Lastly, a person is guilty of violating the underlying traffic-control signals statute if he does not "stop at a

clearly marked stop line . . . before the intersection [and] remain until an indication to proceed is shown." 75 Pa.C.S.A. § 3112(a)(3)(i).

Lincoln argues that the trial court erred by denying his suppression motion, as "[h]is actual driving, as displayed in the video footage exhibits in the case, was not sufficient to justify [the trooper's] unlawful search and seizure." Lincoln's Brief at 19. Specifically, Lincoln contends that the footage did not show any "weaving" nor did the enhanced footage show that his "vehicle had proceeded beyond the [intersection] stop line before the signal turned red." *Id*. Moreover, Lincoln emphasizes that Trooper Fornwalt's observations were unreliable, as he witnessed these alleged violations while following behind him "by nearly the distance of a football field" and thus "not in [a] position to determine whether or not the Vehicle Code had been violated." *Id*. at 19-20. Indeed, he avers that the trooper "testified under oath that all he could see was 'lights changing from something to something.'" *Id*. at 20.

Additionally, Lincoln asserts that "Trooper Fornwalt's significant arrest numbers . . . attest to his competitive nature" such that his "260 DUI arrests in the last six years" and awareness of "various statewide awards honoring police officers for the sheer volume of their DUI arrests" affected his credibility as a testifying witness. *Id*. at 16. In accordance with this narrative, he emphasizes that the trooper "admitted he was 'looking for DUIs'" the night he pulled Lincoln over, and that "[t]he trooper made differing statements under oath[, at the preliminary hearing and the suppression hearing,] concerning

- 15 -

the manner in which the MVR system was activated." *Id*. at 20. Further, he argues that whereas the trial court agreed "that it would be doubtful that Trooper Fornwalt had reasonable suspicion of DUI to effectuate the traffic stop based upon this Court's review of the MVR" footage, the trooper instead "insisted that the 'weaving' alone . . . provided reasonable suspicion for a stop." *Id*. (some quotations omitted). Accordingly, Lincoln contends that because "[t]here was simply neither reasonable suspicion nor probable cause justifying [the stop,]" the trial court erred by denying his suppression motion. *Id*.

The trial court considered Lincoln's second issue and determined that it was also without merit, reasoning as follows:

> With regard to the suppression motion, [Lincoln] claimed that the arresting state police trooper did not have probable cause for the motor vehicle stop. In support, [he] claims that a digitally enhanced and significantly slowed down version of the trooper's [MVR footage], with use of significant zoomed in features, demonstrates that [Lincoln] had already crossed the white stop line marked on the road at the time the traffic light changed from yellow to red.
>
> However, the evidence must be evaluated based on what was known to the officer at the time of the stop. At the time of a motor vehicle stop an officer's decision about whether he has probable cause to suspect a violation of the motor vehicle code cannot be made in hindsight. An officer must reasonably consider all information made available to him in real time and in real world conditions when making the determination as to whether the officer believed a motor vehicle code violation has been committed. At the time the trooper made the stop, he did not have the benefit of [Lincoln's] digitally enhanced slow-motion video of the suspected traffic violation. . . .

- 16 -

. . . The fact that this court, at the bench trial, found the Commonwealth did not prove the redlight violation beyond a reasonable doubt does not change the fact that at the time the traffic stop was made[,] the evidence known and observed by the state trooper was sufficient to afford [him] with probable cause that a motor vehicle code violation had occurred.

Trial Court Opinion, 12/20/24, at 2-3 (unnecessary capitalization omitted).

Based on our review of the suppression record, we conclude the evidence and testimony supports the trial court's order denying suppression. Pertinently, Trooper Fornwalt testified that he observed Lincoln enter an intersection after the traffic signal had changed from yellow to red. This observation, if reasonably made, gave Trooper Fornwalt probable cause to stop Lincoln for committing a traffic violation. *See Bush*, 166 A.3d at 1283 (stating that a police officer has probable cause to stop a motor vehicle if he observes a traffic violation). Relevantly, although enhanced MVR footage ultimately showed that Lincoln did not commit the red-light violation, we reiterate that a finding of probable cause did not require the trooper's observation to be correct. *See Martin*, 101 A.3d at 721. Instead, the trial court needed only to determine that, based on the totality of the circumstances at the time of the violation, there was a probability that Lincoln committed the violation. *See id*.

While we acknowledge that Trooper Fornwalt was eighty to 100 yards behind Lincoln when he observed him drive through the intersection in the middle of the night, we similarly highlight that Lincoln could only disprove the trooper's belief that he ran a red light after significantly slowing down and replaying the MVR footage multiple times. Moreover, we emphasize that even

- 17 -

though the trial court viewed this slowed-down footage multiple times during the suppression hearing, it explained that it still could not determine whether Lincoln had committed the violation. Accordingly, these circumstances plainly support a finding that Trooper Fornwalt's real-time observation and belief that Lincoln committed the underlying red-light violation was not unreasonable, and that a probability therefore existed that Lincoln indeed drove through a red light. *See id*.; *see also Bush*, 166 A.3d at 1283. Consequently, we determine that Lincoln's second issue is similarly without merit.

As we determine that both of Lincoln's issues are meritless, we affirm his judgment of sentence.

Judgment of sentence affirmed.
Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 07/08/2025